**IN THE SUPREME COURT OF PENNSYLVANIA
EASTERN DISTRICT**

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 725 CAP |
| | : | |
| | : | Appeal from the Judgment of Sentence |
| Appellee | : | entered on 3/1/13 in the Court of |
| | : | Common Pleas, Westmoreland County, |
| v. | : | Criminal Division at No. CP-65-CR- |
| | : | 0000848-2010. Post Sentence Motions |
| | : | denied on 3/4/16 |
| RICKY SMYRNES, | : | |
| | : | |
| Appellant | : | SUBMITTED: October 28, 2016 |

*OPINION*

**CHIEF JUSTICE SAYLOR**                              **DECIDED: February 22, 2017**

This is a capital direct appeal arising out of Appellant's participation, with a group of five other individuals, in the kidnapping, torture, and murder of Jennifer Lee Daugherty. The case is a companion one to that of co-perpetrator Melvin Knight. *See Commonwealth v. Knight*, ___ Pa. ___, ___ A.3d ___, 2016 WL 6873044 (Pa. Nov. 22, 2016).

## I. Background

In February 2010, Ms. Daugherty visited Greensburg, Pennsylvania, where she encountered Appellant and his five co-perpetrators, including Knight; Appellant's girlfriend, Angela Marinucci; and Amber Meidinger, with whom the victim was previously acquainted. As matters progressed, Marinucci expressed animosity and jealousy

toward the victim, apparently related to their respective expressions of romantic interests in Appellant.[1]

Most of the relevant events that subsequently transpired occurred in Appellant's apartment. The conflict between Marinucci and Ms. Daugherty escalated, and "family meetings" among the co-perpetrators ensued, during which they agreed to inflict progressively worse humiliation and abuse upon the victim, who initially had been invited to -- but came to be imprisoned in -- the apartment. Over a prolonged period of time spanning several days, Ms. Daugherty was bullied, she was forced to ingest prescription medications and noxious substances, she was choked and beaten, her hair was cut against her will by Appellant and Knight, she was raped by Knight, and she was bound with holiday-light strings and garland.

Ultimately, the group voted to kill the victim. Appellant forced her to write a staged suicide note, after which Appellant and Knight dragged her to the bathroom; Knight repeatedly and fatally stabbed her; Appellant slit her wrists (albeit superficially); Appellant and Knight choked her as she lay dying; and her body was placed in a trash can.

Appellant and Knight moved the can and body outside to a remote location, where these were discovered the next day. Apparently in light of developing evidence that a disturbance had occurred in Appellant's apartment, police began to interview the co-perpetrators, and inculpatory statements were obtained.

Meidinger pled guilty to murder and served as a central prosecution witness at Appellant's capital trial, where she attested to the above events. After the jury received

---

[1] There are indications in the record that Marinucci in fact maliciously lured Ms. Daugherty, who was challenged with cognitive limitations, to Greensburg. *See, e.g.*, N.T., Feb. 8, 2016, at 709.

instructions concerning accomplice and conspiratorial liability, Appellant was convicted, *inter alia*, of first-degree murder, conspiracy, and kidnapping.

At the penalty hearing, the Commonwealth pursued, and the jury found present, the aggravating circumstances involving torture and a significant history of felony convictions involving the use or threat of personal violence. *See* 42 Pa.C.S. §§9711(d)(8), (9). One or more jurors also found mitigation in the form of "mental illness, childhood physical abuse, [and] childhood sexual abuse." N.T., Feb. 28, 2013, at 1191. Upon balancing, however, the jurors unanimously agreed that the aggravating factors outweighed the mitigation and, accordingly, returned the death verdict. *See* 42 Pa.C.S. §9711(c)(1)(iv).

This direct appeal followed, in which Appellant presents fifteen claims for relief.

## II. Sufficiency of the Evidence

While Appellant does not challenge the sufficiency of the evidence supporting his first-degree murder conviction,[2] this Court automatically undertakes such review in capital direct appeals. *See, e.g.*, *Commonwealth v. Rivera*, 603 Pa. 340, 354, 983 A.2d 1211, 1220 (2009). In considering the proofs, we are cognizant that a defendant cannot be convicted of first-degree murder under a vicarious liability theory, such as accomplice or conspiratorial liability, unless the fact-finder determines, upon proof beyond a reasonable doubt, that the defendant personally harbored a specific intent to kill. *See, e.g.*, *Commonwealth v. Pagan*, 597 Pa. 69, 102, 950 A.2d 270, 290 (2008). Of course, on appellate review, evidential sufficiency is assessed in the light most

---

[2] Appellant, however, does challenge the sufficiency of the evidence of aggravation relevant to the jury's penalty determination. That separate matter, therefore, is discussed in the course of addressing his specific arguments. *See infra* Part IV(E).

favorable to the Commonwealth, which secured the verdict. *See, e.g.*, *Rivera*, 603 Pa. at 354-55, 983 A.2d at 1220.

Here, although Appellant did not inflict the fatal wounds, the record contains much evidence demonstrating that he intentionally conspired to, and aided in, bringing about Ms. Daugherty's death with a malicious state of mind. *See Commonwealth v. Moore,* 594 Pa. 619, 628, 937 A.2d 1062, 1067 (2007) (discussing the elements of first-degree murder, including the requirements of specific intent to kill and malice). Indeed, Meidinger's testimony portrays Appellant as the leader of the group of co-perpetrators.[3] There is also much evidence of consciousness of guilt on Appellant's part, including his participation in attempting to create the appearance of a suicide, removing the victim's

---

[3] *See, e.g.*, N.T., Feb. 7, 2013, at 560 (reflecting Meidinger's testimony that Appellant was in control of his apartment); *id.* at 575, 595-96 (indicating that Appellant set out to embarrass and humiliate the victim); *id.* at 589-93 (demonstrating Appellant's efforts to conceal the victim's presence in the apartment from outsiders); *id.* at 596-97 (stating that Appellant and Knight stripped the victim of her clothes and cut her hair with shears); *id.* at 601, 607 (attesting that Appellant directed other co-perpetrators not to allow the victim to leave the apartment); *id.* at 605 (reflecting that Appellant hit and kicked Ms. Daugherty); *id.* at 609 (evidencing Appellant's question to Ms. Daugherty: "Why should I let you live?"); *id.* at 619 (memorializing Appellant's orchestration of the vote among the co-perpetrators concerning whether the victim should live or die); *id.* at 621 (evincing that Appellant and Knight bound the victim); *id.* at 622-24 (reflecting that Appellant directed the victim to write the suicide note and his explanation to co-perpetrators that he wished for the killing to appear as if it were a suicide); *id.* at 624-25 (evidencing Appellant's directive to Knight, immediately before the killing, that "you know what to do," as well as Appellant's participation in forcing the victim into the bathroom where Knight stabbed her); *id.* at 626 (indicating that Appellant gave Knight the knife used to kill the victim); *id.* at 631 (stating that, after the stabbings, Appellant expressed concern that the victim still was not dead and, along with Knight, choked her with a holiday-light string); *see also* Brief for Appellant at 6 (conceding that "[t]he group [of co-perpetrators] *unanimously* voted to kill" Ms. Daugherty (emphasis added)).

The Commonwealth also adduced evidence from another witness indicating that Appellant had confessed to her that he had participated in killing Ms. Daugherty. *See* N.T., Feb. 11, 2013, at 875-876 (testimony of Laura Piper).

body from his apartment, and cleaning up the crime scene. *See, e.g.*, N.T., Feb. 7, 2013, at 622-24, 636-37. In short, the evidence of record amply supports vicarious criminal liability, on Appellant's part, for the capital crime as determined by the jury's verdict.

### III. Guilt-Phase Claims for Relief

### A. Alleged Failure to Disclose Impeachment Material

Appellant first complains that the prosecution failed to disclose to the defense "any proposed plea agreement" between the Commonwealth and central prosecution witness Meidinger. Brief for Appellant at 10. Citing to *Commonwealth v. Strong*, 563 Pa. 455, 761 A.2d 1167 (2000), Appellant explains that this type of information is relevant to potential self-interest and bias. *See id.* at 463, 761 A.2d at 1171 (citing *United States v. Giglio*, 405 U.S. 150, 154, 92 S. Ct. 763, 766 (1972), for the proposition that "[a]ny implication, promise or understanding that the government would extend leniency in exchange for a witness' testimony is relevant to the witness' credibility"). Additionally, Appellant asserts that, subsequent to her participation at his trial, Meidinger was permitted to plead guilty to third-degree murder and related offenses, receiving a negotiated sentence of forty to eighty years' incarceration.

The Commonwealth responds by way of reference to Meidinger's attestation at Appellant's trial to the effect that she had received no plea offers and did not enter into any agreement in exchange for her testimony. *See* N.T., Feb. 7, 2016, at 529-30. Rather, the Commonwealth indicates, Meidinger related that she appeared as a prosecution witness to facilitate closure for the benefit of Ms. Daugherty's family. *See id.* at 657.

We agree with the Commonwealth that Appellant's first claim is unsustainable, because it lacks any tangible support. *Accord Commonwealth v. Smyrnes*, No. 848 C 2010, *slip op.* at 12 (C.P. Westmoreland Mar. 4, 2016) ("Defendant's contention amounts only to speculation, as he has presented no evidence whatsoever of any promise or agreement between the Commonwealth and Meidinger."). Appellant's suggested rationale -- that because a plea arrangement with Meidinger was implemented after his trial therefore an agreement must have existed when she testified -- rests on nothing more than the logical fallacy *post hoc, ergo propter hoc* (after this, therefore resulting from it) and is simply not a basis for relief from a conviction.

## B. Claim of Late or Incomplete Discovery

Next, in a three-sentence argument, Appellant contends that the Commonwealth consistently provided "either late or incomplete discovery," prejudicing the defense. Brief for Appellant at 10. Appellant observes that Rule of Criminal Procedure 573(b)(1) imposes a mandatory duty upon the Commonwealth to disclose certain evidence.

In reply, the Commonwealth highlights Appellant's failure to identify any specific items that were not disclosed or to explain how abstractly-asserted late disclosures prejudiced him. Given that the claim is presented solely through bald indications, it is the Commonwealth's position that it is waived. *See Commonwealth v. Johnson*, 604 Pa. 176, 191, 985 A.2d 915, 924 (2009) ("[W]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived.").

We agree with the Commonwealth that, in the absence of any elaboration concerning the specific discovery items in question and/or the particular timing concerns in issue, Appellant's treatment of this claim is simply too cursory to be considered on its merits. *Accord Smyrnes*, No. 848 C 2010, *slip op.* at 13 ("Because Defendant has not

provided any specific instances where discovery was not disclosed, and has instead provided only a boilerplate allegation, this Court cannot engage in an analysis of whether the Commonwealth actually violated any rules of discovery, or whether the correct remedy was offered to Defendant.").

## C. Preclusion of Expert Testimony to Rebut Elements of Conspiracy

Appellant further contends that the trial court erred by granting the Commonwealth's motion *in limine* to prevent Doctor of Psychology Alice Applegate from opining whether Appellant "had the requisite intent to engage in a Conspiracy to Commit First Degree Murder." Brief for Appellant at 11. He explains that psychiatric testimony is generally admissible to negate the element of specific intent to commit first-degree murder. *See Commonwealth v. Weinstein*, 499 Pa. 106, 114, 451 A.2d 1344, 1347 (1982). Momentarily, Appellant's presentation shifts to an explanation that he had produced an expert report from Dr. Applegate opining that Appellant was incapable of understanding the asserted object of the conspiracy as a result of mental retardation.

Appellant's argument then returns to the element of specific intent to commit first-degree murder, stressing that the Commonwealth "must prove that each individual taking part in [a] conspiracy equally and individually possess" such a particularized state of mind. Brief for Appellant at 12 (citing *Commonwealth v. Wayne*, 553 Pa. 614, 630-31, 720 A.2d 456, 464 (1998). Appellant concludes:

> It follows that as criminal conspiracy to commit First Degree Murder requires the same underlying elements of First Degree Murder, and as psychiatric testimony is admissible to negate First Degree Murder, it should be equally admissible to negate the elements of Criminal Conspiracy to Commit First Degree Murder.

Brief for Appellant at 12.

Appellant's position would have substantial force -- relative to the question of specific intent -- had he attempted, at trial, to present expert evidence to demonstrate that he lacked such intent. The difficulty, however, is that he specifically and repeatedly disavowed any attempt to do so. *See* Memorandum In Support of Providing Expert Testimony to Negate the "Agreement" Element of the Conspiracy Charge in *Smyrnes*, No. 848 C 2010, at 10 ("The Defendant intends on calling Dr. Applegate to demonstrate to the trier of fact that he did not understand any agreement and/or its objectives. *This element is separate and apart from 'intent.'*" (emphasis added)); *id.* at 8 ("Intent is its own separate element and *Dr. Applegate will not be addressing that element.*" (emphasis added)); *accord* N.T., Feb. 4, 2013, at 13 (reflecting defense counsel's assertion during a sidebar conference at trial that "I'm not arguing intent" to support the admission of Dr. Applegate's testimony).

In light of this approach taken in the pre-trial and trial proceedings, Appellant cannot now rely upon the *Weinstein* decision's narrow authorization "that psychiatric testimony which speaks to the legislatively defined state of mind encompassing a specific intent to kill is admissible." *Weinstein*, 499 Pa. at 113, 451 A.2d at 1347. Significantly, moreover, the *Weinstein* Court further explained that:

> [P]sychiatric testimony relevant to the cognitive functions of deliberation and premeditation is competent on the issue of specific intent to kill. Thus psychiatric testimony is competent in Pennsylvania on the issue of specific intent to kill if it speaks to mental disorders affecting the cognitive functions necessary to formulate a specific intent. *Where, as here, it does not, it is irrelevant and hence inadmissible.*

*Id.* at 114, 451 A.2d at 1347 (emphasis added).

Appellant's proffer of Dr. Applegate's opinion, by its terms, falls outside this the specific authorization and within the express prohibition. Further, his suggested syllogism -- that because the elements of first-degree murder and conspiracy may

overlap, and expert mental-health testimony is admissible pertaining to the elements of first-degree murder, the same rule should apply to conspiracy -- is a false one. In this regard, the narrow rule of admissibility pertains only to a single element of first-degree murder, *i.e.*, specific intent to kill. While arguably the precept should extend to the identical element of the crime of conspiracy to commit first-degree murder, *Weinstein*, by its explicit terms, precludes extension to other elements of either crime.[4] In the circumstances, therefore, Appellant has failed to present any creditable basis for relief.

### D. Hearsay Statements Made by the Victim

Appellant asserts that the trial court erred by admitting declarations of the victim through the hearsay testimony of Meidinger. The complained-of statements are: "Jen was saying that she was going to [be] marrying [Appellant]," N.T., Feb. 7, 2013, at 549, and "Jen was, uhm, asking [Appellant] to sleep with her," *id.* at 559. According to Appellant, the Commonwealth's purpose in adducing these was to demonstrate that the victim had a romantic interest in Appellant, motivating the murder, which was at "the behest of an envious Angela Marrinucci – the Appellant's girlfriend." Brief for Appellant at 14.

Apparently because Appellant's trial counsel did not specifically object to the evidence as it was adduced onto the record, he takes the position that the trial court had

---

[4] Appellant's arguments are not framed to adduce a policy assessment from this Court concerning the restrictiveness of the Pennsylvania approach as posited in *Weinstein*. In this regard, we note only that jurisdictions diverge widely in their treatments. *See generally* PAUL H. ROBINSON, 1 CRIM. L. DEF. §64 (2016) (summarizing the four main positions taken by American courts, *i.e.*: admitting any evidence of mental disease or defect to negate any culpable state of mind that is an element of the offense; allowing such evidence only to negate a specific-intent element; permitting such evidence only in murder cases to negate malice or premeditation; and foreclosing admission of any evidence of mental illness or infirmity short of insanity).

made a threshold ruling allowing those statements. *See id.* at 13 (asserting that, in response to the defense's blanket objection to Meidinger's testimony concerning anticipated hearsay, the trial court "indicated that the statements fell under the exception to the hearsay rule as excited utterances"). We take a different view of the record, however.

During the relevant interchange, Appellant's guilt-phase attorney asked the trial court to instruct Meidinger not to address any statements made by the victim to her. *See* N.T., Feb. 7, 2013, at 514. The trial judge, however, declined to do so on the basis that she wished to hear the relevant questions in context before rendering rulings on objections. *See id.* (reflecting the trial court's assertion that "I won't know [whether hearsay exceptions apply] until I hear them"). The discussion segued into a focus on the victim's statement "why are you doing this to me" as she was being beaten, *see id.* at 515-517, and during this interchange the trial judge expressed a belief that such a statement qualified as an excited utterance, *see id.* at 516. In response to the defense's continued effort to secure a blanket preclusive ruling, the following interchange ensued:

> [The Prosecutor]: Judge, he's asking us to give a foundation when we won't don't [sic] know what the objection is.
>
> THE COURT: [Counsel], I certainly can't remember every word that Ms. Meidinger said.
>
> [Defense Counsel]: I'm not suggesting that. We flushed out those hearsay exceptions and it's on the record. I just don't want to keep standing up and objecting so I will try to object consistent with your ruling so as not to disrupt the court.
>
> THE COURT: I'm not stopping you from objecting, believe me. You try the case whatever way you need to try it. As I

said, I can't remember everything she said, what Meidinger's testimony was. *We'll just address them as they come up.*

[Defense Counsel]: No problem.

*Id.* at 517-18 (emphasis added).

On this record, we differ with Appellant's position that the trial court issued a threshold ruling *permitting* any and all testimony by Meidinger concerning statements by the victim on a wholesale basis. Rather, while guilt-phase counsel may have had a different impression, the record only reflects that the trial court denied Appellant's request for a blanket *preclusive* ruling. To the degree that counsel conveyed a perspective that a broader ruling had been made authorizing admission of Meidinger's testimony concerning any and all statements of the victim, and stated his own desire to curtail his objections during Meidinger's testimony, neither expression reflects an actual ruling by the trial court that would relieve the lawyer of the obligation to lodge timely objections to the testimony going forward.

Accordingly, we conclude that Appellant's present challenge to the relevant statements is unpreserved.

### E. Cross-Examination of Meidinger Concerning Medication Effects

In his next claim for relief, Appellant takes the position that the trial court erroneously precluded his lawyer from adequately exploring the effect upon prosecution witness Meidinger's ability to think rationally and recall events when she failed to take her prescription mediation. The relevant background is as follows.

At the outset of his cross-examination of Meidinger, guilt-phase counsel confirmed that the witness had not been taking her prescription medications, one of which was an antipsychotic drug, throughout the events giving rise to the killing of the victim. Further, he elicited testimony from Meidinger indicating that, when unmedicated,

she does not think rationally, her ability to perceive is altered, and it is difficult for her to understand what is happening around her. *See* N.T., Feb. 7, 2013, at 649. The witness, however, denied suffering from hallucinations. *See id.*

Continuing the line of inquiry, guilt-phase counsel asked "Your ability to retain information is also affected when you do not take your medication?" *Id.* At this juncture, the district attorney lodged an objection and the following discussion ensued among him, defense counsel, and the trial judge:

> [The Prosecutor]: Judge, I'm going to object. This has to be limited to a time frame. Is this before February 2010?
>
> [Defense Counsel]: She said she wasn't on her meds. I'm asking what happens when she is not –
>
> [The Prosecutor]: During that time.
>
> THE COURT: Just say at that time this happened to you.
>
> [Defense Counsel]: When you're not on your meds. In order for me to establish what happened at that time when she's not on her meds I'm sure there's things that happened to her that were happening in 2010.
>
> [The Prosecutor]: He's asking a general when you don't take your meds what happens to you. Do you have any issues.
>
> THE COURT: Just ask about what was happening to you in February 2010.
>
> [Defense Counsel]: I'm going to get to that. I wanted to establish what happens to her when she's not on her meds and I want to establish if these things were happening to her if that's okay.
>
> [The Prosecutor]: Whatever happens to her when she doesn't take her meds prior to February 2010 is not relevant.

[Defense Counsel]: It's very relevant, judge.

[The Prosecutor]: It's not. What's relevant is if he's going after her recollection of what occurred during the time period when this happened, then the only thing that is relevant is during that time period.

THE COURT: During the time period. I would agree because she could respond differently in a different time. She could respond now. She might be on a different medication now. I don't know. Just confine it to at that time, February of 2010.

N.T., Feb. 7, 2013, at 649-51; *accord id.* at 662 (reflecting the trial judge's indication to defense counsel that "[y]ou can ask about how [Meidinger] used her meds").

In the subsequent questioning, Meidinger denied that she suffered from any diminishment of her ability to recall the events surrounding the killing. *See, e.g.*, *id.* at 654 ("I remember everything that happened in that house. There's just a lot of things that happened in there."); *id.* ("I remember clearly everything that happened but on the – of step by step it's hard for me to do it like in order."). At this point, guilt-phase counsel shifted his inquiries to other subjects.

After alluding to the above background, the argument presented in Appellant's brief proceeds as follows:

The ability to perceive, remember, and relate events lies at the core of a witness's competency. *See Com*[*monwealth*] *v. Ware*, [459 Pa. 334, 353,] 329 A.2d 258, 268 (1974). If Meidinger's lack of medication substantially affected her competency as proposed by her limited testimony, the Court should have allowed defense counsel to explore this issue in the purview of the jury to better assess her credibility.

Brief for Appellant at 14-15.

In response, the Commonwealth acknowledges that the impact of drugs on a witness's ability to perceive, remember, and relate events is a relevant inquiry on cross-

examination. *See, e.g., Commonwealth v. Harris*, 578 Pa. 377, 388, 852 A.2d 1168, 1174 (2004).[5]   Nevertheless, the Commonwealth highlights this Court's precedent limiting the relevant time period pertaining to such inquiries to those surrounding the criminal episode in question. *See, e.g., id.* (indicating that, while intoxication of the witness at the time of the occurrence is generally relevant, "the jury should *not* consider for impeachment purposes the use of drugs or alcohol at other irrelevant times" (emphasis in original)); *Commonwealth v. Small*, 559 Pa. 423, 444, 741 A.2d 666, 677 (1999). *See generally* ROGER PARK & TOM LININGER, NEW WIGMORE IMPEACHMENT AND REHAB. §8.2.2 (1st ed. 2017 Supp.) ("Courts are reluctant to allow impeachment that simply refers to the fact of alcoholism or substance abuse without specific reference to impairment of the perception or memory at issue in the instant case.").   Moreover, the Commonwealth observes that Appellant has not explained with any specificity how the trial court impermissibly limited his counsel's cross-examination or how it prejudiced him.

We agree with the Commonwealth's position.   As the trial court observed, the questions posed to Meidinger by defense counsel were highly generalized and untethered to the time period addressed by her testimony, to the degree that there was not even an assurance that responses would so much as involve the same medications as were prescribed at that time.   Although the limitation imposed by the trial court to February 2010 may have been unduly restrictive (as, for example, a depiction by the witness of impairments due to the same period of abstinence from the same

---

[5] *Cf. Greene v. Wainwright*, 634 F.2d 272, 276 (5th Cir. 1981) (holding that categorical limits imposed by a trial court on the cross-examination of a central prosecution witness -- thus preventing the defense from addressing mental-health concerns arising from an incident of the witness's bizarre behavior reasonably contemporaneous with the alleged criminal episode for which the defendant was on trial -- violated the defendant's constitutional right of confrontation).

medications in January 2010, if there were any such impairments, might be deemed relevant), guilt-phase counsel made no effort to sharpen his inquiries along these sorts of lines. Rather, the defense's highly general questions simply were met with a meritorious challenge to their abstractness.

In this vein, we agree with the Maryland Court of Appeals' admonition that:

> A trial judge's refusal to allow a line of questioning on cross-examination amounts to exclusion of evidence; preservation for appeal of an objection to the exclusion generally requires a formal proffer of the contents and relevancy of the excluded evidence. . . .
>
> Of course, the proffer of a defendant whose cross-examination has been restricted does not need to be extremely specific, for the obvious reason that the defendant cannot know exactly how the witness will respond, especially when the cross-examination is an attempt to show bias. Nevertheless, the proffer must at least be sufficient to establish that the cross-examination will likely reveal information nominally relevant to the proceeding. A simple assertion that cross-examination will reveal bias is not sufficient to establish a need for that cross-examination; *it is necessary to demonstrate a relevant relationship between the expected testimony on cross-examination and the nature of the issue before the court.*

*Grandison v. State,* 670 A.2d 398, 413-14 (Md. 1995) (emphasis added; citations and footnotes omitted).[6]

Here, at least in light of defense counsel's failure to advise the trial court that he intended to attempt to confine his questioning according to the prescription medications in issue and any reasonably contemporaneous episodes of impairment, we discern no error in the trial court's exercise of its discretionary authority to control the cross-

---

[6] Although this passage is focused on cross-examination pertaining to bias, it reasonably extends more broadly to other instances of cross-examination such as the present one.

examination.  *See Commonwealth v. Ballard,* 622 Pa. 177, 200, 80 A.3d 380, 394 (2013) ("The scope of cross-examination is a matter within the discretion of the trial court and will not be reversed absent an abuse of that discretion.").

## F.  Cross-Examination Pertaining to Escape Planning

Appellant next argues that the trial court should have permitted the defense to inquire more deeply than was allowed into Meidinger's correspondence with co-perpetrator Knight.  Initially, during cross-examination, Appellant's attorney was able to adduce, from Meidinger, testimony that she and Knight remained in contact while incarcerated via letters.  *See* N.T., Feb. 7, 2013, at 658.  When counsel asked whether there was an attempt to "sneak letters by going through [a co-perpetrator's] family or [the witness's] sister," the trial court sustained a Commonwealth objection.  *Id.*  Counsel then attempted to utilize a prior statement given by Meidinger to the effect that she planned an escape from jail, to which the prosecutor also objected, *see id.* at 659, and the trial court ultimately sustained the challenge on the basis that the conduct was not *crimen falsi*, *see id.* at 667-68.

Appellant argues that the court's ruling was erroneous, because Meidinger's escape planning through intermediaries demonstrated her ability for complex thought, including planning, coordination, and problem solving.  According to Appellant, the information was essential to rebut purported allusions by the district attorney and the trial judge, throughout Meidinger's testimony, indicating that Meidinger was of limited intelligence and incapable of understanding complex words and questions.  In this regard, Appellant cites to a passage of the trial transcript documenting a sidebar discussion among the judge and the attorneys.  *See* Brief for Appellant at 15-16 (quoting N.T., Feb. 7, 2013, at 668-669).

The Commonwealth replies that cross-examination into the alleged escape attempt was irrelevant to the trial issues. Furthermore, it highlights that the jurors were not privy to the sidebar discussion referenced by Appellant and suggests that Meidinger's intellectual capacities were not otherwise discussed before the jurors by either the prosecutor or the trial judge.

Again, the trial court had broad discretion in the conduct of cross-examination, "especially on collateral matters." *Commonwealth v. Garcia*, 478 Pa. 406, 425, 387 A.2d 46, 56 (1978). Here, we credit the Commonwealth's position, in the first instance, that Appellant has failed to demonstrate that the prosecution portrayed its witness before the jury as incapable of complex thought. Accordingly, and given that such asserted portrayal is encompassed within an essential proposition grounding Appellant's present argumentation, this claim necessarily fails.

**G. Photograph of the Victim**

Next, Appellant complains that the trial court erred in permitting the Commonwealth to introduce into evidence a photograph of the victim over a defense objection. According to Appellant, the photograph was outdated, as it was taken nearly two years before the killing, and it depicted a young, innocent-looking woman which was not representative of the victim's appearance closer in proximity to her death. It is Appellant's position that the photograph was irrelevant to the trial issues and served only to engender sympathy.

The Commonwealth, for its part, relies upon the general rule that the admission of photographic evidence is a matter vested within the sound discretion of the trial court. *See* Brief for Appellee at 23 (citing *Commonwealth v. Tharp*, 574 Pa. 202, 222-23, 830 A.2d 519, 531 (2003)). The Commonwealth observes that the photograph showed the victim's appearance before her hair was shorn by Appellant and Knight and she was

grievously injured as depicted in the autopsy photographs; this, the Commonwealth posits, assisted the jury in evaluating the nature of the Appellant's and his co-perpetrators' conduct. According to the Commonwealth, the fact that Ms. Daugherty appeared to be young and innocent is of no moment, as the victim's mother testified that the photograph accurately depicted her appearance before the murder. N.T., Feb. 12, 2013, at 1130.

This Court has disapproved of the use of a live-victim photograph to demonstrate that a victim was a life in being, where such element is uncontested in a murder case. *See, e.g.*, *Commonwealth v. Rivers*, 537 Pa. 394, 406-07, 644 A.2d 710, 716 (1994). According to the *Rivers* Court, "[o]nly where the victim's character or physical abilities are called into question will such evidence be relevant." *Id.* at 407, 644 A.2d at 716.

Here, we differ with the *dictum* that there are only two possible instances in which an in-life photograph of a victim might be relevant in a murder case. Presently, the Commonwealth established a plausible basis for relevance, contrasting the length of the victim's hair as depicted in the picture and verified by Ms. Daugherty's mother (longer style with curled ends) with the appearance when the victim's body was presented for autopsy (at which time her hair was cut close to the scalp in a haphazard fashion, *see* N.T., Feb. 5, 2013, at Exs. C-14, 16, 17, 18). The contrasting images were corroborative of Meidinger's testimony concerning an instance of domination which occurred during the kidnapping ordeal preceding Ms. Daugherty's murder.

We recognize that it was by no means essential to the prosecution to place this photograph before the jury. Moreover, we caution the Commonwealth concerning the value of restraint in scenarios involving potential prejudice connected with such non-essential evidence. Nevertheless, given that the photograph had some relevance, and

the limited use of it made by the Commonwealth,[7] we decline find an abuse in the trial court's discretionary evidentiary ruling.

## H. Limitations on Expert Testimony Related to Duress

Appellant next claims that the trial court erred in limiting Dr. Applegate's guilt-phase testimony adduced to support a defense of duress. Appellant explains that, during the guilt phase of trial, defense counsel called Dr. Applegate to elaborate on mitigating circumstances connected with the crime, including her opinion that Appellant is mildly mentally retarded, thus rendering him susceptible to influence by others and, as relevant here, to Knight. *See* N.T., Feb. 13, 2013, at 1220-1288. Brief for Appellant at 17 ("[T]he defense attempted to submit a mitigating factor of the Appellant's character as it related to his susceptibility to duress to establish that the Appellant acquiesced in the commission of the crime out of fear of the co-defendant, Melvin Knight."). According to Appellant, however, the trial court limited the testimony with regard to duress, "impeding Appellant's ability to present mitigating circumstances." Brief for Appellant at 17. Appellant notes that, in capital cases, defendants may present any admissible evidence relevant to any mitigating circumstances, including any evidence regarding the character and record of the defendant. *See* Brief for Appellant 17 (citing *Ballard*, 622 Pa. at 212, 80 A.3d at 401, and *Commonwealth v. Travaglia*, 611 Pa. 481, 498, 28 A.3d 868, 878 (2011)).

---

[7] In questioning the victim's mother about the picture, the prosecutor only asked if the photograph represented an accurate image of her daughter when she last left the parents' home and whether the length of her hair was similar to that shown. *See* N.T., Feb. 12, 2013, at 1150-1151. In his closing remarks, the prosecutor then referred to the photograph a single time, again in connection with the hair-cutting episode. *See* N.T., Feb. 14, 2013, at 1389.

Preliminarily, Appellant's argument confuses a defense as to criminal culpability at the guilt-phase of a capital trial, namely duress, *see Commonwealth v. Markman*, 591 Pa. 249, 283, 916 A.2d 586, 606 (2007), with the presentation of mitigating evidence in a capital sentencing proceeding, *see* 42 Pa.C.S. §9711(c), (e). Moreover, as the Commonwealth observes, Appellant has not identified any portion of the trial transcript in which the trial court restricted Dr. Applegate's testimony as it pertained to duress.[8] Under such circumstances, we find the presentation of this claim to be underdeveloped to the extent that it does not warrant further consideration. *See Johnson*, 604 Pa. at 191, 985 A.2d at 924.

## IV. Penalty-Phase Claims for Relief

### A. Denial of Motion *In Limine* to Preclude the Torture Aggravator

Appellant contends that the aggravating factor of torture, *see* 42 Pa.C.S. §9711(d)(8), by its terms, cannot apply in instances in which a killing is physically perpetrated by an accomplice or conspirator. In this regard, Appellant analogizes the torture aggravator to the aggravating circumstance of killing in the perpetration of a felony, *see id.* §9711(d)(6), which this Court has found only applies if the defendant served as an actual instrumentality of the victim's death. *See Commonwealth v. Lassiter*, 554 Pa. 586, 595, 722 A.2d 657, 662 (1998) (plurality). Appellant emphasizes

---

[8] Indeed, from our independent review, it appears that most of the objections asserted by the Commonwealth during the course of Dr. Applegate's direct examination were overruled by the trial court. *See, e.g.*, N.T., Feb. 13, 2013, at 1237, 1247, 1248, 1252, 1257, 1263, 1270, 1286. Those that were sustained would not appear to have meaningfully curtailed Appellant's presentation of the expert testimony. *See, e.g., id.* at 1232 (reflecting the sustaining of an objection to the effect that a question was leading); *id.* at 1250 (in response to a prosecution objection, requiring defense counsel to rephrase a question); *id.* at 1271 (directing defense counsel to "move on" from further inquiry into information that had not been relied upon by the expert).

that the *Lassiter* lead opinion focused on the word "committed" -- which appears in both the in-perpetration-of-a-felony and torture aggravators -- and explained that the term requires the defendant to have perpetrated the murder "in the sense of bringing it to completion or finishing it." *Id.*

The Commonwealth, for its part, relies on *Commonwealth v. Daniels*, 537 Pa. 464, 644 A.2d 1175 (1994), in which this Court approved the application of the torture aggravator to a conviction for first-degree murder premised on an accomplice liability theory. *See id.* at 470, 473-74, 644 A.2d at 1178, 1180. The Commonwealth, however, candidly recognizes that the appellant, in *Daniels*, does not appear to have raised the argument that the torture aggravator simply does not concern those who only are vicariously liability for a killing. *See* Brief for Appellee at 28.[9]

Insofar as Appellant's position rests on *Lassiter*, we note that there is a material distinction between Sections 9711(d)(6) and (d)(8). The former is phrased in the active

---

[9] The Commonwealth also argues that *Lassiter* can be distinguished because the plurality opinion indicates that "if an accomplice is found guilty of first-degree murder, the Commonwealth may still seek the death penalty if it can prove that an aggravating circumstance other than §9711(d)(6) applies." *Lassiter*, 554 Pa. at 596, 722 A.2d at 662. From this, the Commonwealth reasons that "the prohibition against using the (d)(6) aggravator against an accomplice was only to be applied to (d)(6)." Brief for Appellee at 28.

The fact that a proscription against the use of the Section 9711(d)(6) aggravator against an accomplice applies only to that aggravator is self-evident and is irrelevant to consideration of the argument that the reasoning by which the Court determined that such aggravator does not apply to an accomplice applies equally to another provision of the statute, *i.e.*, the torture aggravator, because the latter contains some of the same material language as the former. *Cf. Commonwealth v. Chapman*, ___ Pa. ___, ___, 136 A.3d 126, 132-33 (2016) (reasoning that the word "felony," as used within two different aggravating circumstances, should be accorded the same meaning). Unfortunately, however, the Commonwealth fails to discuss the issue in terms of the substantive language common to both the in-perpetration-of-a-felony and torture aggravators that Appellant expressly has placed in issue.

voice, requiring that "*the defendant committed* a killing while in the perpetration of a felony." 42 Pa.C.S. §9711(d)(6) (emphasis added). Conversely, the latter is phrased in the passive voice, dictating that "[*t*]*he offense was committed* by means of torture." *Id.* §9711(d)(8). Thus, Section 9711(d)(8) bears an interpretation that an accomplice or conspirator of the defendant could be the instrumentality of the death, even though Section 9711(d)(6) does not allow for such an interpretation. Indeed, given the phraseology employed in Section 9711(d)(8), we find this to be the more likely meaning intended by the General Assembly.

We realize that this Court is charged with imposing a narrowing construction upon the death penalty statute consistent with both the rule of lenity and constitutional norms. *See Chapman*, ___ Pa. at ___, 136 A.3d at 133 (citing *Zant v. Stephens,* 462 U.S. 862, 877, 103 S. Ct. 2733, 2742 (1983) (holding that, to satisfy the constitutional standard derived from *Furman v. Georgia,* 408 U.S. 238, 92 S. Ct. 2726 (1972), an aggravating circumstance "must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant as compared to others found guilty of murder")). Nevertheless, the Court is not bound to impose the narrowest construction possible in derogation of legislative intent. *See, e.g.*, *Commonwealth v. Wooten,* 519 Pa. 45, 53, 545 A.2d 876, 880 (1988).

When a criminal defendant is vicariously liable for a first-degree murder and himself possesses both the intention to kill and to torture -- which the jury at Appellant's trial found was true of him -- we conclude that the "offense" can have been "committed by means of torture," although the defendant was not the actual instrumentality of the death. 42 Pa.C.S. §9711(d)(8). In this regard, we find it implausible that the Legislature

would have intended that the term "offense" would not subsume the actual killing in a first-degree murder case.[10]

The remainder of Appellant's arguments in the pertinent passages of his brief contesting the sufficiency of the evidence to establish torture, particularly given that Appellant was not a direct, physical instrumentality in causing Ms. Daugherty's death. *See* Brief for Appellant at 18-21. In the present framework – *i.e.*, in the context of a claim styled as a challenge to the trial court's failure to award pre-trial relief -- such contentions are technically moot. *See Commonwealth v. Walter,* 600 Pa. 392, 401, 966 A.2d 560, 565 (2009) ("Any claims of inadequacy [the a]ppellant alleges with respect to pre-trial matters have been rendered moot by the subsequent independent judicial judgment confirming the existence of the aggravating circumstance in this case." (internal quotations and citations omitted)). Accordingly, we will consider the sufficiency question in connection with our review, below, of the portion of Appellant's brief specifically directed to such subject. *See infra* Part IV(E).

---

[10] We are cognizant of the *Lassiter* plurality's focus on the word "committed" and acknowledge that the term is common to both the in-perpetration-of-a-felony and torture aggravators. Nevertheless, the *Lassiter* lead opinion simply may have taken for granted that the word is preceded by the specification that "*the defendant* committed" the killing, 42 Pa.C.S. §9711(d)(6) (emphasis added), which is simply absent from the torture aggravator, which, again, requires only that "*the offense* was committed" by means of torture, *id.* §9711(d)(8) (emphasis added).

We also realize that this Court has previously discussed the aggravating circumstance of torture in the active voice. *See, e.g.*, *Commonwealth v. Haney*, ___ Pa. ___, ___, 131 A.3d 24, 39 (2015) (quoting *Commonwealth v. Karenbauer,* 552 Pa. 420, 447, 715 A.2d 1086, 1099 (1998) (indicating that "the Commonwealth must prove beyond a reasonable doubt that *the defendant* intentionally inflicted on the victim a considerable amount of pain and suffering that was unnecessarily heinous, atrocious, or cruel, manifesting exceptional depravity" (emphasis added))). In this line of cases, however, the Commonwealth had adduced evidence of the defendant's physical perpetration of the killings; thus, the specific issue now before the Court simply did not arise.

**B.** **Use of Juvenile Adjudications and Burglary as Crimes of Violence in Aggravation**

Appellant next contends that the trial court erred by permitting the Commonwealth to present Appellant's juvenile adjudications for aggravated indecent assault and burglary, based on conduct that occurred when he was eleven years old, in support of the significant-history-of-violent-felony-convictions aggravator. *See* 42 Pa.C.S. §9711(d)(9). Appellant first highlights that juvenile adjudications bear limited relevance in discretionary sentencing determinations outside the capital sentencing arena. *See, e.g.*, 204 Pa. Code §303.6(a)(1) (conditioning the counting of juvenile adjudications in determining prior record scores upon, *inter alia*, the offense having occurred on or after the defendant's fourteenth birthday). Appellant then discusses "an illogical incongruity that allows the Commonwealth to utilize juvenile adjudications of an eleven year old as an aggravating factor to impose the death penalty." Brief for Appellant at 24.

Appellant does not identify where in the record a challenge to the Commonwealth's use of juvenile adjudications has been preserved, as is required under Rule of Appellate Procedure 2117(c). From our own review of the record, we find it to be noteworthy that Appellant conceded for purposes of pre-trial motions that juvenile adjudications are admissible to establish the (d)(9) aggravator under precedent of this Court. *See* Brief in Support of Defendant's Motion to Strike and/or Quash Aggravating Factors in *Smyrnes*, No. 848 C 2010, at 1 ("For the purposes of this Motion, the Defendant concedes that it is appropriate for the Commonwealth to proceed with and introduce evidence (juvenile adjudications) pertaining to [the (d)(9)] aggravating factor." (citing, *inter alia*, *Commonwealth v. Baker*, 531 Pa. 541, 567-68, 614 A.2d 663, 676 (1992))). During the penalty phase, moreover -- although Appellant lodged an objection

to the use of his adult conviction for conspiracy to commit burglary, discussed below -- he also does not appear to have raised the age factor as a basis for preclusion of the juvenile adjudications, as he attempts now. Accordingly, we find this aspect of his present contentions to be waived. *See generally Commonwealth v. Freeman*, 573 Pa. 532, 560-61, 827 A.2d 385, 402 (2003) (abolishing the doctrine of relaxed waiver in capital direct appeals).

Appellant furthermore advances an argument that, because his juvenile adjudication for burglary was of an unoccupied home, and his adult conviction for conspiracy to commit burglary was of a facility that was not adapted for overnight accommodations, neither should be deemed to reflect a crime of violence for purposes of the (d)(9) aggravator. Again, however, Appellant fails to specify any place in the record where such challenges have been preserved. *See* Pa.R.A.P. 2117(c).[11] Indeed, the transcript appears to demonstrate that there was an explicit concession by penalty-phase counsel directed to these matters. *See* N.T., Feb. 19, 2013, at 39 (reflecting penalty-phase counsel's remark at sidebar that "[t]he law is clear that a burglary is per se a crime of violence so I'm not arguing that"). *See generally Commonwealth v. Rios*, 591 Pa. 583, 624, 920 A.2d 790, 814 (2007) (indicating, in the context of a capital post-conviction appeal, that "burglary is always classified as a violent crime in Pennsylvania"), *disapproved on other grounds*, *Commonwealth v. Tharp*, 627 Pa. 673, 101 A.3d 736 (2014). The argument that the attorney did present was that a conviction for conspiracy to commit burglary should not be treated the same as one for the

---

[11] Although certainly Appellant's penalty-phase counsel emphasized these factors in her cross-examination of Commonwealth witnesses, *see, e.g.*, N.T., Feb. 19, 2013, at 162, it does not appear that she offered them to the trial court as a basis for contesting the admissibility of the juvenile adjudication for burglary and/or conviction for conspiracy to commit burglary.

substantive crime of burglary. *See* N.T., Feb. 19, 2013, at 39. This, position, however, is not advanced in the present briefing and, accordingly, also is not available for review at this juncture.

## C. Opinion of the Forensic Pathologist Regarding Torture

Appellant asserts that the trial court should not have permitted the forensic pathologist presented by the Commonwealth at the penalty stage, Cyril H. Wecht, M.D., to testify that various of the stab wounds inflicted upon Ms. Daugherty were perpetrated to inflict pain and suffering. According to Appellant, such testimony exceeded the scope of the pathologist's expertise. *See* Pa.R.E. 702 (sanctioning the admission of an expert opinion based on scientific, technical, or other specialized knowledge beyond that possessed by laypersons if it "will help a trier of fact to understand the evidence or to determine a fact in issue"). It is Appellant's position that Dr. Wecht "possesses nothing in his educational background, nor was he ever qualified as an expert in psychiatry or psychology, that would have allowed him to offer an opinion, with any degree of scientific certainty, as to the state of mind of the Appellant." Brief for Appellant at 27. Additionally, Appellant contends that Dr. Wecht's testimony usurped the jury's function in determining intent.

The Commonwealth, for its part, highlights the decisional law approving testimony by pathologists concerning pain and suffering. *See, e.g.*, *Commonwealth v. Johnson*, 615 Pa. 354, 388-89, 42 A.3d 1017, 1036-37 (2012). According to the Commonwealth, the broader testimony concerning the intent of the actor during the stabbing of the victim was equally within the scope of the expertise of a forensic pathologist.

In the course of developing the challenge to Dr. Wecht's testimony during the penalty proceedings, penalty-phase counsel offered several reasons against admission.

First, counsel renewed the objection based on *Lassiter*. *See* N.T., Feb. 25, 2013, at 336-338. She also claimed a lack of adequate notice that the Commonwealth would adduce the relevant testimony from the pathologist. *See id.* at 343-346. Finally, counsel asserted that an expert witness may not opine as to ultimate issues for the jury, such as intent. *See id.* at 347.

We have addressed and rejected Appellant's position regarding *Lassiter* above. *See supra* Part IV(A). With respect to the notice issue, Appellant does not presently advance such matter in his brief. In terms of the ultimate-issue concern, Pennsylvania Rule of Evidence 704 specifies that "[a]n opinion is not objectionable just because it embraces an ultimate issue." Pa.R.E. 704. Finally, Appellant does not specify where in the record his present challenge to Dr. Wecht's expert qualifications to render an opinion concerning intent to torture was preserved, *see* Pa.R.A.P. 2117(c), and, from our own review, it does not appear that this was raised in the penalty proceedings. Accordingly, this facet of his claim also is not available for present consideration.

### D. Rebuttal Concerning Ability to Plan Activities of Daily Living

Appellant next challenges certain of the Commonwealth's evidence offered to rebut expert testimony presented by the defense to the effect that Appellant was mentally retarded and, therefore, ineligible for capital sentencing. *See Atkins v. Virginia*, 536 U.S. 304, 321, 122 S. Ct. 2242, 2252 (2002) (holding that the Eighth Amendment to the United States Constitution prohibits the imposition of the death penalty upon offenders who are mentally retarded). Such testimony included attestations that Appellant had a limited capacity to plan activities of daily living. *See, e.g.*, N.T., Feb. 25, 2013, at 481-483 (testimony of defense witness Dr. Alice Applegate).

By way of counterpoint, among other evidence, the Commonwealth adduced testimony from Ms. Carol Danube, who supervised a group home, relating that

Appellant called her on the telephone to advise that he would be removing a young woman from the facility. *See* N.T., Feb. 27, 2013, at 927. Appellant indicated that he would be assuming supervision of the woman's funds and assisting her in day-to-day living. *See id.* It was the Commonwealth's position that such testimony demonstrated that Appellant was capable of planning.

According to Appellant, "[i]t remains unclear how an individual making unrealistic demands and braggadocios arguments demonstrates a distinct ability to plan." Brief for Appellant at 28-29. Appellant notes that the testimony conveyed nothing to establish an understanding, on Appellant's part, of the procedure for actually assuming control or guardianship over the individual. It is therefore Appellant's position that the evidence was non-probative and, moreover, inflammatory. *See id.* at 29.

From our point of view, the evidence in question concerned a collateral matter with limited relevance and potential prejudice, and it would have been preferable for the trial court to sustain Appellant's timely objection. Nevertheless, applying the high threshold in assessing whether a trial court has abused its discretionary authority to admit evidence, *see, e.g. Commonwealth v. Hairston*, 624 Pa. 143, 157, 84 A.3d 657, 664-65 (2014) (explaining that finding an abuse of discretion on appellate review requires the the trial court's decision be "a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support as to be clearly erroneous" (quoting *Commonwealth v. Dillon*, 592 Pa. 351, 359, 925 A.2d 131, 136 (2007)), and recognizing that it is not sufficient that an appellate court might have reached a different conclusion, *see id.*, ultimately we discern no actionable error.

### E. Sufficiency of the Evidence to Support Imposition of the Death Penalty

In a short passage of his brief cross-referencing arguments presented in other sections, Appellant contends that "there is an insufficient basis upon which the jury

could, and should, have imposed the death sentence in this matter." Brief for Appellant at 29.

With regard to the aggravating circumstance involving a significant history of violent felony convictions, *see* 42 Pa.C.S. §9711(d)(9), we have rejected Appellant's legal challenge as presented to the juvenile-adjudication and burglary aspects. *See supra* Part IV(B). Moreover, given this Court's precedent that such adjudications, as well as a burglary conviction, qualify as "convictions involving the use or threat of violence to the person" for purposes of the (d)(9) aggravator, 42 Pa.C.S. §9711(d)(9),[12] several such convictions validly were available to the jury to ground its determination.

Concerning the torture aggravator, Appellant has otherwise argued that the killing in the present case cannot satisfy the statutory requirement that it be committed "by means of torture," when various of the heinous abuses inflicted upon Ms. Daugherty did not actually result in her death. Appellant acknowledges that, in this case, "the actors engaged in a course of conduct of depraved actions: forcing the victim to drink urine and feces, cutting her hair, assaulting her, and binding her wrists and ankles." Brief for Appellant at 19. Nevertheless, it is Appellant's position that, "[a]s heinous as these acts may have been, her death resulted from an entirely different course of conduct – the fatal stab wounds inflicted by co-defendant Melvin Knight." *Id.*

Appellant also draws a sharp distinction between the deplorable abuses taking place before the "family vote" to murder Ms. Daugherty and those taking place after it. *See id.* at 19-20 ("As there was seemingly no intent to kill [Ms.] Daugherty before the unanimous 'family vote,' [Ms.] Daughtery was not killed by means of torture, but rather a distinct stabbing event taking place subsequent to a vote."); *see also id.* at 21

---

[12] *See Baker*, 531 Pa. at 567-68, 614 A.2d at 676 (holding that juvenile adjudications qualify as "convictions" for purposes of the significant-history aggravator); *Rios*, 591 Pa. at 624, 920 A.2d at 814 (depicting burglary as a *per se* crime of violence).

(recognizing that the acts of Appellant toward the victim were "demeaning and assaultive" but asserting that they nonetheless "lacked a causative connection with her death"). Furthermore, Appellant stresses this Court's approach, in prior cases involving asserted torture, of maintaining a limiting construction of the aggravating circumstance. *See, e.g., id.* at 20 (citing *Commonwealth v. Ockenhouse*, 562 Pa. 481, 492, 756 A.2d 1130, 1136 (2000)).

From our point of view, however, the jury was not obliged to gauge Appellant's intent according to the timing of the "family vote" to commit murder. Notably, the Commonwealth had adduced extensive evidence that Appellant was in control of his own apartment, *see* N.T., Feb. 7, 2013, at 560; he repeatedly threatened Ms. Daugherty and stated that he wanted to embarrass and humiliate her, *see id.* at 572, 575, 580, 595-96; he participated in pouring oatmeal and spices on her head, *see id.* at 584; he directed and assured that the victim would be held against her will and concealed from outsiders in the apartment, *see id.* at 589, 591; he and Knight cut the victim's hair against her will and stripped her of her clothes, *see id.* at 594, 596-597, 601, 607; he told others not to allow the victim to leave the apartment, 601, 607; he hit and kneed the victim, *see id.* at 605, 609; he administered to the victim medication that was prescribed for another, *see id.* at 605; he asked the victim why he should permit her to live, *see id.* at 609; he called a meeting among the co-perpetrators to determine whether Ms. Daugherty should die, *see id.* at 619; he told Knight to retrieve holiday-light strings from the attic to bind the victim, *see id.* at 620; he participated in actually binding the victim with the strings and garland, *see id.* at 621; he forced the victim to write the false suicide note, *see id.* at 622-624; he directed Knight to proceed with the killing, *see id.* at 624; he supplied Knight with the murder weapon, *see id.* at 626; he slit the victim's wrists, *see id.* at 629, and he participated in choking the victim with light strings as she

was dying, *see id.* at 631. Moreover, the jury was entitled to determine that many of the twenty-four stab wounds inflicted on the victim by Knight -- after Appellant directed Knight that "you know what to do," *id.* at 624 -- were intended to cause further pain and suffering unnecessary to the actual killing.

Significantly, the entire course of conduct may be deemed relevant to determining whether the victim was tortured, not merely the final act giving rise to the victim's death. *See, e.g.*, *Commonwealth v. Chambers*, 602 Pa. 224, 255, 980 A.2d 35, 53 (2009). Moreover, the evidence is reviewed in the light most favorable to the Commonwealth as verdict winner. *See, e.g.*, *Commonwealth v. Powell,* 598 Pa. 224, 256, 956 A.2d 406, 425 (2008).

Here, in our judgment, the Commonwealth presented sufficient evidence to support a determination that "[t]he offense was committed by means of torture," 42 Pa.C.S. §9711(d)(8), by demonstrating that a considerable amount of pain and suffering was inflicted upon Ms. Daugherty that was "unnecessarily heinous, atrocious, [and] cruel, manifesting exceptional depravity," *Commonwealth v. Karenbauer,* 552 Pa. 420, 447, 715 A.2d 1086, 1099 (1998), and that Appellant possessed the specific intention for this to occur. *See Commonwealth v. Johnson*, 615 Pa. 354, 388–89, 42 A.3d 1017, 1036–37 (2012) (discussing the requirement of specific intent to torture).[13] We

---

[13] The intent to torture may be proven from the circumstances surrounding the killing. *Commonwealth v. Cox*, 546 Pa. 515, 536, 686 A.2d 1279, 1289 (1996). Factors to be considered in determining whether the torture aggravator applies include, but are not limited to:

> (1) the manner in which the murder was accomplished, including the number and type of wounds inflicted; (2) whether the wounds were inflicted on a vital or non-vital area of the body; (3) whether the victim was conscious when the wounds were received; and (4) the duration of the episode.

(continued…)

appreciate that the statute by its terms requires a connection between the torture and the killing itself, *Chambers*, 602 Pa. at 252, 980 A.2d at 51, and conclude that the Commonwealth's evidence concerning the twenty-four stab wounds inflicted on Ms. Daugherty upon Appellant's direction was in itself enough to satisfy such requirement.

## F.  Weight of the Evidence Pertaining to Penalty

Appellant contends that the death verdict was against the weight of the evidence. His sole argument developed in the pertinent section of his brief rests on his position that the Commonwealth was permitted to utilize two aggravating circumstances (torture and significant history of violent felony convictions) that were improper and unduly prejudicial to the defense.  *See* Brief for Appellant at 29.  The argument thus lacks merit, in light of his failure to demonstrate such invalidity via preserved claims.  *See supra* Part IV(A), (B), (E).

## G.  Refusal to Appoint an Expert to Address Death-Row Conditions

Appellant's last claim involves a challenge to the trial court's refusal, at the post-sentence motions stage, to appoint an expert witness with knowledge of the conditions under which capital prisoners are housed on death row.  Appellant asserts that such conditions are inhumane and violate the proscription of the Eighth Amendment to the United States Constitution against cruel and unusual punishment.

Our statutory duty on review of a death sentence is to correct preserved trial errors and to engage in the specific statutory review required by the Legislature.  *See* 42 Pa.C.S. §9711(h)(2), (3).  Here, however, Appellant's claim is not directed to

---

(…continued)
*Powell,* 598 Pa. at 255-56, 956 A.2d at 425 (citing *Ockenhouse*, 562 Pa. at 493-94, 756 A.2d at 1137).

such considerations but, rather, toward the circumstances of his imprisonment (which obviously are amenable to redress if warranted).  Although such challenges have been deemed cognizable by Pennsylvania courts, *see, e.g.*, *Lopez v. Pa. DOC*, 119 A.3d 1081, 1090-92 (Pa. Cmwlth. 2015), we decline to require the trial courts to appoint experts to facilitate their advancement in the context of a direct appeal challenging a capital judgment of sentence.

## H.  Statutory Review

At this stage, we are required to affirm Appellant's judgment of sentence unless we find it to have been the product of passion, prejudice, or any other arbitrary factor, or that the Commonwealth's evidence does not support at least one aggravating factor. *See* 42 Pa.C.S. §9711(h)(3).  After reviewing the record, we are persuaded that the sentence imposed upon Appellant was not the product of passion, prejudice, or any other arbitrary factor, but rather, resulted from the evidence that Appellant deliberately and maliciously participated in the torture and murder of Ms. Daugherty, as well as the jurors' appropriate service of their function in capital litigation per the governing statutory scheme.  Finally, we have otherwise found that the evidence was sufficient to establish both aggravating circumstances found by the jury, based on this Court's prior precedent. *See supra* Part IV(E).

## V.  Holding

The judgment of sentence is affirmed, and the Prothonotary is directed to transmit the record to the Governor as directed by the death-penalty statute. *See* 42 Pa.C.S. §9711(i).

Justices Baer, Todd, Donohue, Dougherty and Mundy join the opinion.

Justice Wecht did not participate in the consideration or decision of this case.