J-S30028-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ROBERT LARK, | : | |
| | : | |
| Appellant. | : | No. 3856 EDA 2017 |

Appeal from the Judgment of Sentence, November 9, 2017,
in the Court of Common Pleas of Philadelphia County,
Criminal Division at No(s):  CP-51-CR-0120121-1980.

BEFORE:  PANELLA, P.J., KUNSELMAN, J., and MUSMANNO, J.

MEMORANDUM BY KUNSELMAN, J.:                    **FILED AUGUST 19, 2019**

Robert Lark appeals from the judgment of sentence imposed following his conviction of first-degree murder, kidnapping, possession of an instrument of crime ("PIC"), and terroristic threats.[1]  We affirm.

The trial court set forth the relevant factual and procedural history underlying this appeal as follows.

> On October 28, 1978, Lark followed [Tae Bong Cho] from a bank across the street from [Cho's] restaurant to [Cho's] home. . . . As [Cho] was going up the steps of his house while holding his baby and walking with his other young son, [Lark] exited his car, went up the steps and pointed a gun at the baby's head. [Lark] threatened [Cho] and robbed him of approximately $5,000.
>
> [Police apprehended Lark shortly after the robbery, and Cho's money and bank receipts were found in Lark's vehicle, along

---

[1] 18 Pa.C.S.A. § 2502(a), 18 Pa.C.S.A. § 2901(a)(4), 18 Pa.C.S.A. § 907(a), 18 Pa.C.S.A. § 907, 18 Pa.C.S.A. § 2706.

with a BB gun which resembled a .45 caliber pistol.] Lark was arrested and charged with robbery. [Police brought Lark to the police station where he encountered Cho, in the process of rendering a police report; Cho immediately identified Lark as the robber.] A preliminary hearing was scheduled for February 23, 1979. On the night before the hearing, a masked man entered the restaurant, and shot [Cho] in the head[, killing him.] The witnesses were unable to identify the masked man.

While the robbery case was open, [Lark] made repeated threats to Assistant District Attorney Charles Cunningham, [who was prosecuting the robbery case against Lark,] both on the telephone and in the court house [sic] where [Lark] was scheduled for hearings on the robbery [of Cho] and also a completely separate [robbery] case. As a result of the threats, 24[-]hour police protection was provided to Mr. Cunningham and his family.

[Despite Cho's death, the robbery case proceeded to trial in 1979. After the close of the Commonwealth's case, Lark failed to appear for the remainder of trial, and was convicted of robbery and related offenses *in absentia*.]

[While a fugitive, Lark] circulated freely and bragged to acquaintances that he had murdered [Cho]. Law enforcement authorities considered [Lark] to be a prime suspect for the murder. [Lark made phone calls to the police homicide unit and threatened the officers involved in the murder investigation.] On January 9, 1980, police spotted [Lark] in a car in North Philadelphia. As police gave chase [Lark] entered the home of Sheila Morris . . . and held Ms. Morris and her two children hostage. Following a protracted standoff, [Lark] was arrested at Ms. Morris' house[, and charged with murder, terroristic threats, kidnapping and related offenses. At the time of his arrest, Lark possessed an address book listing an address and telephone number for "Cunningham"].

Trial Court Opinion, 7/13/18, at 2-3 (citations to the record omitted); ***see***

***also Commonwealth v. Lark***, 543 A.2d 491, 492-95 (Pa. 1988).

Lark's first murder trial ended in a mistrial in 1981. Following a second

trial in 1985, Lark was convicted of first-degree murder and sentenced to

- 2 -

death. Our Supreme Court affirmed his judgment of sentence. *Lark*, 543 A.2d at 502. Lark's petitions for post-conviction collateral relief were unsuccessful. *See Commonwealth v. Lark*, 698 A.2d 43 (Pa. 1997), and *Commonwealth v. Lark*, 746 a.2d 585 (Pa. 2000). However, in 2012, the United States District Court for the Eastern District of Pennsylvania ordered a new trial for Lark pursuant to *Batson v. Kentucky*, 476 U.S. 79 (1986), on the grounds of racial discrimination in the jury selection. *See Lark v. Beard*, 2012 U.S. Dist. LEXIS 105710 (E.D. Pa. July, 30, 2012).

Following a third trial conducted in 2017, a jury convicted Lark of first-degree murder, kidnapping, PIC, and terroristic threats, as indicated above. On November 9, 2017, the trial court sentenced him to life imprisonment, followed by twenty-two and one-half to forty-five years of incarceration. Lark filed a timely notice of appeal. Both Lark and the trial court complied with Pa.R.A.P. 1925.

Lark raises the following issues for our review:

1. Did the lower court err in admitting the former testimony of numerous Commonwealth witnesses where [Lark] had been deprived of a right to full and fair cross-examination at the prior proceeding due to the Commonwealth's failure to disclose police activity sheets relating to the investigation when they were requested by [Lark]?

2. Did the lower court err in admitting evidence of threats made to prosecution witness [ADA] Cunningham on June 11, 1981 when said threats were not listed on the bills of information and had no relevance with respect to any of the enumerated charges?

3. Did the lower court err in permitting the Commonwealth to introduce [Lark's] wedding photo and to use the photograph in closing argument?

4. Did the lower court err in refusing to permit defense counsel to question potential jurors during *voir dire* regarding the fact that the allegations in the case would involve the murder of a Commonwealth witness?

5. Did the lower court err when it refused to permit the defense to tell jurors in *voir dire* that it vigorously contested the charges?

6. Did the lower court err in precluding [Lark] from cross-examining the assigned detective, [Lawrence] Gerrard, regarding a prior incident in which he was found by the Superior Court to have improperly induced a criminal defendant into confessing?

7. Did the lower court err in precluding [Lark] from cross-examining Det. Gerrard as to whether promises had been made to the Commonwealth witnesses in the instant case?

8. Did the lower court err in denying [Lark's] request for a mistrial when the Commonwealth elicited testimony that [Lark's] sentencing on June 11, 1981 was for a separate robbery unrelated to the charges in question?

9. Did the lower court err in denying [Lark's] request for a mistrial after Commonwealth witness [ADA] Cunningham informed the jury that the "prior proceeding" regarding the instant case was in fact a trial?

10. Did the trial court err in denying [Lark's] request for a mistrial after the prosecutor's closing argument improperly asked the jury to draw a negative inference against [Lark] because [Lark] did not present his nephew as a witness?

11. Did the trial court err in denying [Lark's] request for a mistrial after the prosecutor's closing argument improperly referred to the inadmissible hearsay of Muriel Jackson?

Lark's Brief at 2-3.

Lark's first three issues implicate the trial court's authority to admit or exclude evidence. Our standard of review concerning the admissibility of evidence is well-settled:

> The admission of evidence is solely within the discretion of the trial court, and a trial court's evidentiary rulings will be reversed on appeal only upon an abuse of that discretion. An abuse of discretion will not be found based on a mere error of judgment, but rather occurs where the court has reached a conclusion that overrides or misapplies the law, or where the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will.

**Commonwealth v. Woodard**, 129 A.3d 480, 494 (Pa. 2015).

In his first issue, Lark challenges the admission of the prior testimony of Commonwealth witnesses who testified at his first or second trial, but were deceased at the time of his 2017 trial, and hence "unavailable." Lark's Brief at 16. Under Pennsylvania law, the former testimony of a witness in a criminal proceeding who has since died is competent evidence admissible in a subsequent trial of the same criminal issue:

> Whenever any person has been examined as a witness, either for the Commonwealth or for the defense, in any criminal proceeding conducted in or before a court of record, and the defendant has been present and has had an opportunity to examine or cross-examine, if such witness afterwards dies, or is out of the jurisdiction so that he cannot be effectively served with a subpoena, or if he cannot be found, or if he becomes incompetent to testify for any legally sufficient reason properly proven, notes of his examination shall be competent evidence upon a subsequent trial of the same criminal issue. For the purpose of contradicting a witness the testimony given by him in another or in a former proceeding may be orally proved.

42 Pa.C.S.A. § 5917; **see also** Pa.R.E. 804.1.

Initially, we observe that Lark has not identified any particular Commonwealth witness whose prior testimony was introduced at his 2017 trial. Nor has he identified the place in the record where any such testimony was admitted. *See* Pa.R.A.P. 2119(c) (providing that "[i]f reference is made to the pleadings, evidence, charge, opinion or order, or any other matter appearing in the record, the argument must set forth, in immediate connection therewith, or in a footnote thereto, a reference to the place in the record where the matter referred to appears"); *see also* Pa.R.A.P. 2132. While we could find waiver on this basis, we decline to do so.

Moreover, Lark's assertion is at odds with our Supreme Court's observation that Lark not only had the opportunity to cross-examine the Commonwealth's witnesses at his prior trials, but did, in fact, do so: "the credibility of most of the Commonwealth's witnesses was challenged by [Lark] whose attorney brought out *on cross-examination* that they were themselves incarcerated or being prosecuted by the Commonwealth and expected to receive favorable treatment and/or the Commonwealth's cooperation in exchange for their in-court testimony." *Lark*, 543 A.2d at 499 (emphasis added).[2]

---

[2] In response to Lark's argument, the Commonwealth points us to the specific places in the certified record where the prior testimony of certain Commonwealth witnesses was read into the record at Lark's 2017 trial, and to the portions of those transcripts where Lark's prior counsel cross-examined those witnesses. *See* Commonwealth's Brief at 18-19.

Nevertheless, Lark maintains that he "was deprived of the potentially vital impeachment evidence" contained in fourteen boxes of police activity sheets, and therefore denied a full and fair opportunity to cross-examine the unavailable witnesses. Lark's Brief at 17. Lark claims that he requested the police activity sheets in advance of his 1985 trial, but the Commonwealth successfully objected to the production of those documents on the basis that the request was too onerous. **Id**. On the theory that the now-missing police activity sheets may have contained summaries of statements made by the unavailable Commonwealth witnesses, Lark asserts that he is entitled to a new trial. **Id**.

Additionally, while Lark characterizes the missing police activity sheets as containing "potentially vital impeachment evidence," the record suggests otherwise. Lieutenant William Shelton testified in connection with Lark's 1985 trial that the activity sheets were solely for internal police "administrative purposes" to indicate "where and what . . . detectives did at a certain time and a certain date" and "ha[d] nothing to do with the statements of any witnesses." N.T. Trial, 6/25/85, at 104, 142. Lieutenant Shelton further testified that the activity sheets are "not part of the case and . . . not submitted to the district attorney's office." **Id**. at 104.

Moreover, at the October 2, 2017 hearing on the Commonwealth's motion to admit the prior testimony of unavailable witnesses, the prosecutor explained that each of the witnesses was deceased, the defense had been

provided with their statements prior to the first trial, and that Lark's counsel had extensively cross-examined each of the witnesses at trial. N.T. Trial, 10/2/17, at 7-8. The prosecutor further explained that, at the time of the homicide investigation, records were kept differently, and that the activity sheets were not limited to one case; rather, "they would keep a running activity sheet pretty much of homicide." *Id*. at 11. Thus, she explained, it was unclear as to how much of the fourteen boxes of activity sheets would have been pertinent to Lark's case.[3] *Id*. Finally, she indicated that Lark's prior counsel had been given the opportunity to review the police activity sheets. *Id*. at 10.

We find Lark's argument is specious, at best. The trial court was presented with evidence that Lark's prior counsel had viewed at least some of the police activity reports. The mere possibility that the remaining administrative police activity reports *might* have contained summaries of statements provided by those witnesses which *might* have differed from their actual statements is highly speculative, and falls short of demonstrating that Lark was prejudiced by the absence of those reports.[4] Based on the record

---

[3] Lieutenant Shelton expressed similar concerns when he testified that it would take him "days" to go through the boxes of police activity sheets and delete out everything unrelated to Lark's case. N.T. Trial, 6/25/85, at 142.

[4] Lark's reliance on **Commonwealth v. Bazemore**, 614 A.2d 684 (Pa. 1992), and **Commonwealth v. Johnson**, 758 A.2d 166 (Pa. Super. 2000), is unavailing, as those cases are factually and legally distinguishable from the

before us, we discern no abuse of discretion by the trial court in admitting the prior testimony of Commonwealth witnesses who had died or otherwise become unavailable in the thirty-year period since Lark's second trial. Accordingly, Lark's first claim merits no relief.

In his second issue, Lark contends that the trial court abused its discretion by admitting irrelevant evidence of threats that Lark made to ADA Cunningham during his June 11, 1981 sentencing hearing. "Relevance is the threshold for admissibility of evidence." **Commonwealth v. Tyson**, 119 A.3d 353, 358 (Pa. Super. 2015); **see also** Pa.R.E. 402. "Evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence[,] and the fact is of consequence in determining the action." Pa.R.E. 401; **see also Tyson**, **supra** at 358 (stating that "[e]vidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable or supports a reasonable inference or presumption regarding a material fact."). "Evidence that is not relevant is not admissible." Pa.R.E. 402. In addition, "[t]he court may exclude relevant

_____

case *sub judice*. In **Bazemore**, our Supreme Court held that the defendant was denied a full and fair opportunity to cross-examine the unavailable witness at the prior proceeding because the Commonwealth failed to provide the witness's prior inconsistent statement to the defense. 614 A.2d at 687. In **Johnson**, a panel of this Court concluded that the defendant was denied a full and fair opportunity to cross-examine an unavailable witness due to the Commonwealth's failure to disclose the witness's prior inconsistent statement. 758 A.2d at 172. Here, there is simply no evidence that the Commonwealth withheld from Lark any inconsistent statement by any witness.

evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Pa.R.E. 403.

Further, Pa.R.E. 404(b) prohibits the admission of prior crimes, wrongs or acts "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Pa.R.E. 404(b)(1). However, such evidence may be admissible for other purposes, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Pa.R.E. 404(b)(2); *see also Commonwealth v. Drumheller*, 808 A.2d 893, 905 (Pa. 2002) (holding that courts will allow evidence of prior bad acts where the distinct crime or bad act was part of a chain or sequence of events which formed the history of the case and was part of its natural development). In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice. Pa.R.E. 404(b)(2).

Accordingly to Lark, the criminal information charged him with one count of terroristic threats based on threats that Lark made to ADA Cunningham via telephone on November 26, 1979. In light of this single charge, Lark claims that the threats he later made to ADA Cunningham at his sentencing hearing on June 11, 1981, were not relevant. Additionally, characterizing the threats he made at the sentencing hearing as prior bad acts evidence, Lark argues

that "the prejudice resulting from this testimony clearly outweighed the negligible value of the evidence." Lark's Brief at 18. On this basis, Lark asserts that he is entitled to a new trial.

In its Pa.R.A.P. 1925(a) opinion, the trial court explained that the threats Lark made to ADA Cunningham at the sentencing hearing were admissible to show Lark's consciousness of guilt and to explain the history of the case and natural development of facts. Trial Court Opinion, 7/13/18, at 8. We find no abuse of discretion in the trial court's determination.

At the sentencing hearing conducted on June 11, 1981, Lark made a gun-shooting gesture at ADA Cunningham and stated, "All I know is I don't get mad. I get even." N.T. Trial, 10/19/17, at 178. Lark additionally stated aloud, "If anything should happen to Mr. Campolongo [the homicide prosecutor] or Mr. Cunningham, then try to locate me." *Id*. at 179-82. In a lowered voice, Lark then said to ADA Cunningham, "I hope you're having fun now because later I would be having my fun. I'll get you point[-]blank. No misery. I will get you point[-]blank." *Id*. at 183.

The record further demonstrates that Lark told several individuals that he murdered Cho because he was going to testify against Lark at the preliminary hearing for the robbery offense.[5] Lark also threatened numerous

---

[5] *See* N.T. Trial, 10/24/17, at 22 (establishing that Lark told Michael Johnson that he killed the Korean shop owner); N.T. Trial, 10/24/17, at 47-48 (establishing that Lark boasted to Benjamin Smith that he "croaked" the

other individuals connected with his prosecution, or to whom he had admitted his guilt.[6]

Notably, on appeal of Lark's 1985 convictions, our Supreme Court determined that Lark's threats to ADA Cunningham were relevant to show motive, intent, identity, the natural development of the case, and to complete the story.[7]  The Court stated:

> The circumstantial evidence introduced by the Commonwealth included admissions of the murder made by [Lark] to various others and several threats to others to kill them as he did "the Korean."  Such admissions and threats were strong evidence against [Lark], but the credibility of most of the Commonwealth's witnesses was challenged by [Lark.]  . . .  Thus, the evidence of the terroristic threats made to Assistant District Attorney

_____

Korean who was a witness against him in a case); N.T. Trial, 10/20/17, at 70-72, 100-102 (establishing that Lark confessed to Nate Smith that he shot the Korean in the face shortly before closing, and that had to kill him because he was the only witness against him in a robbery case); N.T. Trial, 10/19/17, at 77-84 (establishing that Lark told Hozell Odom that he was doing "pretty good" in his robbery case with the Korean, "but I had to kill him").

[6] **See** N.T. Trial, 10/27/17, at 6-10 (establishing that Lark called the police homicide unit and threatened to kill the detectives in charge of the murder investigation, noting "You better keep looking over your shoulder.  I can pick you off at any time I want"); N.T. Trial, 10/24/17, at 47-48 (establishing that Lark told Benjamin Smith that "from now, anybody a witness against me, I'm going to kill them"); **Id**. at 73-74 (establishing that Lark sent a letter to Benjamin Smith's common-law wife stating that she should persuade Smith not to testify against Lark, and that if she was unsuccessful, she should "move right away," intimating that he would kill Smith, his children and relatives); N.T. Trial 10/23/17, at 217-18 (where Lark accused Michael Johnson of theft, and threatened to "take care of him like he had done the Korean" unless the items were returned).

[7] The issue arose in connection with Lark's challenge to the trial court's denial of Lark's motion to sever the murder, kidnapping and terroristic threats offenses prior to his 1985 trial.

Cunningham provided a critical link in the Commonwealth's chain of evidence introduced to establish the identity of the killer. The fact that [Lark] murdered the principle witness to a robbery, *i.e.* the robbery victim himself, and then threatened the Commonwealth's prosecutor in the same robbery case (threats which he was quite capable of, and took steps to carry out), was more than mere coincidence. It was in fact, a common and a chronic pattern with [Lark] to threaten to eliminate, and in one case actually eliminate, those who stood in his way. The murder of . . . Cho was not an isolated incident but was a critical link in the chain of evidence, along with the other links of threats, intimidation and related criminal activity which began with the first link, the robbery of . . . Cho, and ended with the last link, the kidnapping wherein [Lark] held a woman and children hostage and threatened to kill the police as he had "the chinkee m___ f___." The four princip[al] crimes (robbery, murder, terroristic threats and kidnapping) involved in this case were all linked together, along with the other threats and intimidation, and presented a clear picture of [Lark's] pattern of destruction and intimidation of the participants in the criminal justice system.

The terroristic threats against Mr. Cunningham . . . were clearly relevant to shed light on [Lark's] motive and intent in murdering Mr. Cho, in establishing his identity by showing a logical connection between the crimes and a common and off-repeated pattern of [Lark], and, importantly in this unique case, to show the natural development of the case and to complete the story.

*Lark*, 543 A.2d at 499.

As indicated by our Supreme Court, Lark's threats against ADA Cunningham, including those made at the June 11, 1981 sentencing hearing, were relevant to show the chain or sequence of events that formed the history of the case, and demonstrate Lark's motive, malice, intent, and ill-will toward ADA Cunningham and other individuals who were involved in his criminal prosecutions or who possessed incriminating information that could be used against him, including Cho. Accordingly, as we discern no abuse of discretion

by the trial court in its implicit finding that the probative value of the June 11, 1981 threats outweighed their prejudicial impact, no relief is due.

In his third issue, Lark contends that the trial court abused its discretion in admitting Cho's wedding photograph. The admission of photographs is a matter vested within the sound discretion of the trial court. *Commonwealth v. Smyrnes*, 154 A.3d 741, 754 (Pa. 2017). Nevertheless, our Supreme Court has disapproved of the use of a live-victim photograph to demonstrate that a victim was a life in being where such element is uncontested in a murder case.[8] *Id*. (stating "we caution the Commonwealth concerning the value of restraint in scenarios involving potential prejudice connected with such non-essential evidence"). In limited circumstances, such as where the victim's character or physical abilities are called into question, or the Commonwealth has established a plausible basis for relevance, the trial court may act within its discretion in permitting limited use of such a photograph at trial. *Id*. at 754-55; *see also Commonwealth v. Rivers*, 644 A.2d 710, 716 (Pa. 1994).

According to Lark, the trial court erred by allowing the Commonwealth to introduce Cho's wedding photograph during the questioning of a witness, and to display the photograph during the prosecutor's closing argument. Lark maintains that the trial court initially admitted the photo to show the likeness

_____

[8] "Life-in-being" evidence is proffered to show that the victim was alive at a time prior to the murder, and thus is relevant to the first element of a murder, *i.e.*, that a human being was unlawfully killed. *See Commonwealth v. Miller*, 746 A.2d 592, 602 (Pa. 2000)

- 14 -

of Cho in his lifetime; however, the following day when Lark moved for a mistrial, the trial court indicated that the photo was admissible to establish that Cho was Korean, and to show his height and weight. Lark argues that, while the photo shows an Asian male, there is nothing in the photo to indicate that Cho was Korean. Lark further argues that there was no way to assess Cho's height based on the photograph. Lark additionally claims that Cho's height and weight were established by the medical examiner. Finally, he asserts that Cho's Korean ethnicity was not in dispute, and was referenced by several witnesses. On this basis, Lark contends that he is entitled to a new trial because the admission of the photo was "nothing more than a pretext by the Commonwealth to play to the sympathy of the jury through the introduction of irrelevant and highly prejudicial evidence." Lark's Brief at 19.

The trial court explained the basis for its evidentiary ruling as follows: "[t]he use of the wedding photograph was proper to show the identity of the deceased and that he was a life in being . . . [it] was not unduly prejudicial and did not deprive [Lark] of his right to a fair trial." Trial Court Opinion, 7/13/18, at 11.

In our view, it does not appear that there was any question that Cho was a life in being up until his murder the day before Lark's preliminary hearing, at which Cho was scheduled to testify. Moreover, Cho's existence as a life in being was established by the medical examiner's testimony that his death resulted from a gunshot wound to the head, and that he died

approximately two hours after he was shot. *See* N.T. Trial, 10/18/17, at 113, 117. Thus, the Commonwealth did not need Cho's wedding photograph to establish this fact. *Rivers*, 644 A.2d at 716.

Nevertheless, the Commonwealth argues that the photograph was admissible under *Smyrnes* because numerous witnesses knew Cho only as "the Korean," and the photograph was relevant to show his Korean ethnicity, as well as his height relative to the height of the shooter. Commonwealth's Brief at 28. The Commonwealth also claims that it "did not present testimony from [Cho's] wife or children about their lives together or any aspect of [Cho's] life," and made limited use of the photograph "showing it to one witness and displaying it briefly in closing argument." *Id*. at 29, 30.

The Commonwealth's argument bears some legitimacy, given that several of the Commonwealth witnesses did, in fact, refer to Cho only as "the Korean." However, based on the record before us, it does not appear that Cho's Korean heritage was ever questioned during the murder trial. Further, the medical examiner testified as to Cho's height. *See* N.T. Trial, 10/18/17, at 112. Thus, we are unconvinced that the photograph was necessary to prove Cho's height or that Cho was of Korean descent.[9]

_____

[9] Moreover, had a photograph been necessary, we note that the Commonwealth should have used a photo of Cho alone, rather than a sentimental portrait of Cho with his bride, in formal wedding attire, on their wedding day. *See Commonwealth v. Blystone*, 549 A.2d 81, 90 (Pa. 1988) (holding that "[e]vidence which has the effect of arousing sympathy for a

However, even assuming that the trial court abused its discretion in admitting the photo, our inquiry does not end here. The question remains as to whether the error in admitting the photograph was harmless beyond a reasonable doubt. *Story*, 383 A.2d at 164. Harmless error exists if the Commonwealth proves either: (1) the error did not prejudice the defendant or the prejudice was *de minimis*; (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict. *Commonwealth v. Fulton*, 179 A.3d 475, 493 (Pa. 2018).

Our review of the record reflects that the uncontradicted evidence of Lark's guilt was so overwhelming, and the prejudicial effect of the photograph so insignificant by comparison, that it is clear beyond a reasonable doubt that the error could not have contributed to the verdict. *Fulton*, *supra* at 493. Additionally, the Commonwealth's use of the photo was limited; the prosecutor showed the photo to one witness, and briefly displayed it during

_____

crime victim is prejudicial and inadmissible when otherwise irrelevant"); *Commonwealth v. Story*, 383 A.2d 155, 159 (Pa. 1978) (holding that "evidence of the victim's family life and the photographs of the victim with his daughter shed absolutely no light on the criminal episode which resulted in [the victim's] death").

his closing argument. *See* Commonwealth's Brief at 29. Additionally, the Commonwealth did not present testimony from Cho's wife or children about their lives together, or any other aspect of Cho's life. *Id*. at 30. **Compare Story**, **supra** (granting a new trial where the prosecution presented extensive emotional testimony about the victim, his life, professional reputation, family, disabled daughter, the fact that his widow had to go back to work after his death, and two photographs of the victim and his daughter on a family vacation, all of which was irrelevant to the question of guilt, and prejudiced appellant by creating sympathy for the victim and his family). Accordingly, we conclude that any error here was harmless beyond a reasonable doubt, and Lark is not entitled to relief on this claim. **See Commonwealth v. Green**, 162 A.2d 509, 519 (Pa. Super. 2017) (*en banc*) ("Not all errors at trial . . . entitle an appellant to a new trial, and the harmless error doctrine, as adopted in Pennsylvania, reflects the reality that an accused is entitled to a fair trial, not a perfect trial." (citation omitted)).

Lark's fourth and fifth issues challenge the trial court's administration of *voir dire* questioning. In assessing these claims, we are guided by the following standard of review.

> The scope of *voir dire* rests in the sound discretion of the trial court, whose decision will not be reversed on appeal absent palpable error. The purpose of *voir dire* is to ensure the empaneling of a competent, fair, impartial, and unprejudiced jury. The scope of *voir dire* should therefore be limited to questions that attempt to disclose a potential juror's lack of qualification or fixed opinion regarding the defendant's guilt or innocence. A prospective juror's personal views are of no moment absent a

- 18 -

showing that these opinions are so deeply embedded as to render that person incapable of accepting and applying the law as given by the court.

*Commonwealth v. Scott*, 2019 Pa. Super. LEXIS 573, *11 (Pa. Super. 2019) (quoting *Commonwealth v. Karenbauer*, 715 A.2d 1086, 1094 (Pa. 1998) (internal citations and quotation marks omitted)). While the parties are permitted to supplement the trial court's *voir dire* examination, this grant is not unrestricted but rather is subject to limitations as the court deems proper. *Commonwealth v. Ellison*, 902 A.2d 419, 427 (Pa. 2006).

In his fourth issue, Lark contends that the trial court abused its discretion by refusing Lark's request to *voir dire* potential jurors as to "whether the fact that the case involved the alleged murder of a Commonwealth witness would affect their ability to be fair." Lark's Brief at 21. While Lark concedes that the trial court explained Cho's role as a witness in general *voir dire*, he complains that "at no time were jurors asked if they could be fair in a case involving the alleged killing of a witness." *Id*. Lark claims that his request was not an effort to learn what the prospective jurors' decisions would be when confronted with that question. *Id*. Rather, he maintains, he "merely sought to identify potential jurors who would fail to keep an open mind or consider any additional evidence and instead automatically vote for death upon learning of this fact." *Id*.

In his argument, Lark relies on the United States Supreme Court's decision in *Morgan v. Illinois*, 504 U.S. 719 (1992), where the High Court

held that during *voir dire* in a capital case, a trial court may not, without violating the Due Process Clause of the 14th Amendment, refuse questioning regarding whether a juror would automatically impose a death sentence following a first degree murder conviction. In explaining its rationale, the Court stated:

> [T]he belief that death should be imposed *ipso facto* upon conviction of a capital offense reflects directly on that individual's inability to follow the law. Any juror who would impose death regardless of the facts and circumstances of conviction cannot follow the dictates of law. It may be that a juror could, in good conscience, swear to uphold the law and yet be unaware that maintaining such dogmatic beliefs about the death penalty would prevent him or her from doing so. A defendant on trial for his life must be permitted on *voir dire* to ascertain whether his prospective jurors function under such misconception.

*Id*. at 735-36 (footnote and internal citations omitted).

Here, the specific *voir dire* question requested by Lark did not include any inquiry as to whether a juror would automatically impose a death sentence following a first degree murder conviction. Instead, the proposed *voir dire* question merely sought to ascertain whether the jurors could be fair and impartial: "It is alleged that the murder victim in this case, . . . Cho, was a Commonwealth witness in [Lark's] robbery case. Would the fact that the allegations concern the alleged killing of a witness prevent you from being a fair and impartial juror?" N.T. Trial, 10/2/17, at 4. As Lark's proposed *voir dire* question was not designed to identify jurors who would impose death regardless of the facts and circumstances of conviction, **Morgan v. Illinois** does not apply.

- 20 -

Moreover, the trial court determined that the requested *voir dire* question was unnecessary, and explained its reasoning as follows:

Prior to the submission of the juror questionnaire forms and the individual questioning of the prospective jurors, the court advised the jury venire that the "Commonwealth alleges that [Cho] was scheduled to testify the next morning at a preliminary hearing in a case wherein [Lark] is alleged to have robbed [Cho] on an earlier occasion." Through the jury questionnaire forms and the individual questioning, each prospective juror was repeatedly asked whether she or he could be fair and impartial.

Trial Court Opinion, 7/13/18, at 7 (citations to the record omitted).

Given that the trial court had already explained Cho's role as a witness and questioned each juror as to his or her ability to be fair and impartial, we discern no abuse of discretion in its decision to disallow Lark's proposed *voir dire* question. Accordingly, his fourth issue entitles him to no relief.

In his fifth issue, Lark contends that the trial court abused its discretion by sustaining the Commonwealth's objection to the following comment by defense counsel to the first venireperson: "let me say we vigorously contest these allegations, but the law requires me to ask some questions about [the penalty] phase of the case." N.T. Trial, 10/2/17, at 60. Lark intended to make the same statement to the remaining venirepersons, and claims that the trial court's ruling "deprived [him] of the ability to explain to prospective jurors that although [Lark's counsel] was asking questions regarding the penalty phase, he was in no way conceding the Commonwealth's allegations in the guilt phase." Lark's Brief at 22. Lark argues that he was prejudiced by the trial court's ruling "since it, in essence, left prospective jurors with the

- 21 -

impression that the Commonwealth had already met their burden with respect to the charges in question. *Id*.

Here, the trial court specifically instructed the first venire panel not to infer guilt on the basis that penalty phase issues were being discussed: "I need you to understand that just because I am discussing the death penalty and that I soon will be asking you questions about the sentence of death or the sentence of life in prison without parole, that does not mean that [Lark] is guilty of first-degree murder." N.T. Trial, 10/2/17, at 47; *see also id*. at 62. The trial court similarly instructed the ensuing four venire panels. *See* N.T. Trial, 10/3/17, at 22; N.T. Trial, 10/4/17, at 23-24; N.T. Trial, 10/10/17, at 23; N.T. Trial, 10/11/17, at 19-20. Moreover, the trial court determined that defense counsel's comment was irrelevant, since "[w]hether or not an accused vigorously contends a case is not relevant to the selection of a jury." Trial Court Opinion, 7/13/18, at 7. Under these circumstances, no discretion was abused.

As we previously explained, the purpose of *voir dire* is to ensure the empaneling of a competent, fair, impartial, and unprejudiced jury. *Scott*, 2019 Pa. Super. LEXIS 573, at *11. Accordingly, the scope of *voir dire* is limited to questions that attempt to disclose a potential juror's lack of qualification or fixed opinion regarding the defendant's guilt or innocence. *Id*. To this end, questions on *voir dire* encompassing legal principles such as the presumption of innocence are improper. *Commonwealth v. Bethea*, 185

A.3d 364, 372 (Pa. Super. 2018) (holding that counsel's reminder to the jury during *voir dire* that the defendant is an innocent man was beyond the scope and purpose of *voir dire*). As defense counsel's comment was unrelated to the discrete purpose of *voir dire*, we discern no abuse of discretion by the trial court in sustaining the Commonwealth's objection. Accordingly, his fifth issue merits no relief.

As Lark's sixth and seventh issues are interrelated, we will address them together. These issues concern the trial court's authority to limit the scope of cross-examination of witnesses at trial. The scope of cross-examination is a matter within the discretion of the trial court and will not be reversed absent an abuse of that discretion. ***Commonwealth v. Ballard***, 80 A.3d 380, 394 (Pa. 2013).

Lark asserts that the trial court abused its discretion by prohibiting the defense from cross-examining Detective Gerrard regarding his actions in the unrelated case of ***Commonwealth v. Lester***, 572 A.2d 694 (Pa. Super. 1990). That case involved a "sex for lies" scandal where police allegedly promised Lester, a prisoner, sexual encounters with his wife and his lovers in exchange for his cooperation and confession in a murder investigation. At a hearing on post-verdict motions, three women testified that that they went to the police administration building, met with Detective Gerrard and/or another detective, signed the log book, and were escorted to Lester's room, where they had sexual intercourse with him. ***Id***. at 697. Although Detective Gerard

testified somewhat differently, the Commonwealth conceded that the sexual encounters had occurred. *Id*. This Court ruled that Lester was coerced into giving his confession by the police's offer of future sexual gratification, and that he was denied effective assistance because his counsel failed to introduce evidence of the sexual conduct at the suppression hearing. Notably, the *Lester* Court made no finding of wrongdoing on the part of Detective Gerrard, nor did it indicate whether his actions resulted in charges or disciplinary proceedings.

Lark wanted to cross-examine Detective Gerrard regarding the "sex for lies" scandal at issue in *Lester*. Lark maintains that several Commonwealth witnesses indicated on cross–examination that they had agreed to police questioning out of fear, or that they were either on parole, had open charges pending at the time police questioned them, or had prior *crimen falsi* convictions. Lark's Brief at 24-26. Lark demonstrated that three of those witnesses were shown leniency in their own criminal cases after providing statements implicating Lark in Cho's murder or testifying against him. *Id*. at 25-26. Lark asserts that he should have been permitted to cross-examine Detective Gerrard, as the lead detective in the homicide investigation, regarding any promises that were made to these witnesses. *Id*. at 26. Lark believes his inability to pursue this "vital line of impeachment" warrants a new trial. *Id*. at 24.

The trial court explained the basis for its decision to deny cross-examination of Detective Gerrard regarding his involvement in *Lester*, as follows:

> The alleged sexual misconduct by police in *Lester* occurred after the instant case. In the instant case, the murder occurred in 1979. [Lark] was arrested in 1980. His first trial occurred in 1981. In *Lester*, the defendant was transferred from [f]ederal custody to the Philadelphia police in 1983. The *Lester* matter was not relevant in testing the credibility of Detective Gerrard in the instant matter. In the instant case, Detective Gerrard obtained statements from witnesses. *Lester* involved a confession by the accused. The *Lester* allegations are of no consequence in determining the instant case. Whatever relevance the *Lester* allegations might have had was outweighed by the danger of confusing the issues and misleading the jury.

Trial Court Opinion, 7/13/18, at 14-15 (internal citations omitted).

We discern no abuse of discretion in the trial court's ruling. The *Lester* matter occurred two years after Lark's first trial. There is no indication in the record that any of the Commonwealth witnesses were offered sex by Detective Gerrard in exchange for testimony against Lark. Thus, the *Lester* matter was of limited relevance, and cross-examination of Detective Gerrard as to the sex-for-lies scandal presented the danger of confusing the issues and misleading the jury. Moreover, Lark was permitted to, and did, cross examine each of the Commonwealth witnesses regarding his or her motives to provide false testimony in exchange for leniency from the Commonwealth. *See Lark*, 543 A.2d at 499. Accordingly, no relief is due on Lark's sixth and seventh issues.

Lark's remaining claims pertain to the trial court's denial of his requests for a mistrial. Our standard of review in assessing the denial of a mistrial is as follows:

> The trial court is in the best position to assess the effect of an allegedly prejudicial statement on the jury, and as such, the grant or denial of a mistrial will not be overturned absent an abuse of discretion. A mistrial may be granted only where the incident upon which the motion is based is of such a nature that its unavoidable effect is to deprive the defendant of a fair trial by preventing the jury from weighing and rendering a true verdict.

*Commonwealth v. Johnson*, 107 A.3d 52, 77 (Pa. 2014).

In his eighth issue, Lark contends that the trial court abused its discretion by denying his request for a mistrial when the Commonwealth elicited testimony that Lark's sentencing on June 11, 1981, was for a separate robbery unrelated to the charges in question. Lark's Brief at 27. Lark concedes that "[the defense] and the Commonwealth had agreed that the June 11, 1981 sentencing would be referred to as a sentencing on an unrelated robbery in order to minimize any prejudice from this evidence of other crime." *Id*. at 28. However, he claims that the Commonwealth violated the agreement, thereby warranting a new trial.

Here, the parties endeavored to minimize the prejudice associated with the anticipated disclosure to the jury that, when Lark made the additional threats to ADA Cunningham, he was being sentenced for a second robbery conviction (unrelated to his conviction for robbing Cho). They agreed that when referencing the threats that Lark's made to ADA Cunningham at the

June 11, 1981 sentencing hearing, they would refer to that proceeding as Lark's sentencing on "an unrelated robbery conviction." N.T. 10/19/17, at 121. The jury subsequently heard testimony that Lark had been convicted of robbing Cho. N.T. Trial, 10/19/17, at 146. Without objection, the prosecutor thereafter referred to the June 11, 1981 sentencing hearing as "an-unrelated– to-this-robbery sentencing proceeding." *Id*. at 171. However, when the prosecutor later stated "[t]his proceeding, so there is no confusion, this was not a sentencing on the robbery of . . . Cho[,]" Lark's counsel objected and moved for a mistrial. *Id*. at 173, 175.

We discern no abuse of discretion by the trial court in denying the request for a mistrial. Implicit in the parties' agreement that they would refer to the June 11, 1981 sentencing hearing as sentencing for "an ***unrelated robbery*** conviction" is the notion that Lark had been convicted of a separate robbery that was unrelated to his conviction for the robbery of Cho. While the prosecutor used words that differed from the precise language agreed to by the parties, the difference was immaterial, since no additional crimes were conveyed to the jury. Accordingly, Lark's eighth issue lacks merit.

In his ninth issue, Lark contends that the trial court abused its discretion when it denied his request for a mistrial following ADA Cunningham's inadvertent reference, when testifying as a witness at the 2017 trial, to Lark's prior homicide "trial." The reference was made during defense counsel's questioning of ADA Cunningham regarding the Cho homicide case. ADA

Cunningham explained that the homicide unit of the District Attorney's office handled the Cho homicide case, and that he was not in the homicide unit. N.T. 10/19/17, at 189-90. The questioning proceeded as follows:

> [Defense Counsel]: However, Mr. Campolongo, who we saw referenced there a couple times, was in fact a homicide DA that handled the homicide case. Is that fair to say?
>
> [The Witness]: I don't think Campolongo was in homicide when he handled the homicide case. I don't know what unit he was in.
>
> [Defense Counsel]: Did he handle the homicide case?
>
> [The Witness]: He handled the trial. He handled the trial in front of –
>
> THE COURT: Let's move on.

*Id*. at 190. Lark claims that he is entitled to a new trial because ADA Cunningham's response "was grossly prejudicial since it clearly informed the jury that a prior trial had taken place and hence that a prior jury had found [Lark] guilty." Lark's Brief at 29.

The trial court determined that ADA Cunningham's use of the word "trial" in his answer was insignificant. The court reasoned that:

> Since events discussed in the present trial occurred more than three decades earlier, the jury would have understood that the instant proceeding was a retrial. Given the overwhelming evidence against [Lark], the mention of the term "trial" could not have contributed to the verdict. Accordingly, the use of the term "trial" was harmless error if, it was error at all.

Trial Court Opinion, 7/13/18, at 10.

We discern no abuse of discretion by the trial court in denying Lark's motion for a mistrial based on the ADA Cunningham's brief reference to Lark's

prior homicide trial. Further, we disagree that Lark's contention that the mention of the word "trial" necessarily conveyed to the jury that Lark was found guilty at the prior proceeding. Indeed, Lark's first trial ended in a mistrial. Moreover, Lark's counsel, rather than the prosecutor, elicited the objectionable testimony when he questioned ADA Cunningham regarding ADA Campolongo's role in the "homicide case." The question confused the witness, who asked for clarification of the word "case" when he mentioned the word "trial."

In any event, even if ADA Cunningham's reference to Lark's prior homicide trial was an error, we agree with the trial court's determination that the error was harmless and could not have contributed to the verdict. *See id*. As indicated previously, our review of the record reflects that the uncontradicted evidence of Lark's guilt was so overwhelming, and the prejudicial effect of a solitary reference to a prior "trial" was insignificant by comparison, that beyond a reasonable doubt the error could not have contributed to the verdict. *See Fulton*, *supra* at 493. Accordingly, Lark's ninth issue entitles him to no relief.

In his tenth issue, Lark contends that the trial court abused its discretion by denying his request for mistrial following the prosecutor's reference, during closing argument, to Lark's failure to call his nephew, Abdul Razak, as a witness. Lark maintains that because the Commonwealth bore the burden of proving his guilt, he was not required to present any evidence at trial "either

through his own mouth or through the mouths of others, and he is not required to prove anything or explain anything whatsoever in his defense." Lark's Brief at 29. He argues that, because the prosecutor's comments amounted to a claim that Lark should have proved his innocence, a new trial is warranted. *Id*. at 30-31.

A prosecutor has reasonable latitude during his closing argument to advocate his case, respond to arguments of opposing counsel, and fairly present the Commonwealth's version of the evidence to the jury. ***Commonwealth v. Cooper***, 941 A.2d 655, 668 (Pa. 2007). While a prosecutor may comment on the credibility of the defendant or other witnesses, it is improper for a prosecutor to express a personal belief as to their credibility. ***Commonwealth v. Sanchez***, 82 A.3d 943, 981 (Pa. 2013). Nevertheless, even an otherwise improper comment may be appropriate if it is in fair response to defense counsel's remarks. ***Commonwealth v. Spotz***, 47 A.3d 63, 97 (Pa. 2012). Any challenge to a prosecutor's comment must be evaluated in the context in which the comment was made. ***Id***. (stating that the effect of the prosecutor's remarks must be evaluated in the context and atmosphere of the entire trial).

By way of background, James Spencer, an acquaintance of Lark's, gave two detailed statements to police that Lark confessed to robbing Cho, and then murdering him to prevent him from testifying about the robbery. However, when Spencer was brought to the courthouse for the 1985 trial,

police inadvertently placed him in the same holding cell as Lark. Lark then threatened Spencer and his family, and instructed Spencer how to lie and to wear his prison uniform while testifying so that would appear less credible. When Spencer took the witness stand a few hours later at Lark's 1985 trial, he recanted his prior statements to police, and claimed that they were lies. At the 2017 trial, the Commonwealth called Spencer as a witness. On cross-examination, the defense elicited testimony from Spencer that he had met Lark's nephew, Razak, while in prison, and told Razak that he and the other witnesses against Lark had lied. N.T. Trail, 10/25/17, at 102, 107. On redirect, Spencer admitted that he did not know the other witnesses against Lark, or whether any of them had lied. *Id*. at 103-04.

In his closing argument, defense counsel suggested that Spencer provided false statements to police in order to get a favorable deal for himself on his then-pending criminal matters. The prosecutor thereafter addressed the credibility of Spencer's recantation testimony in his closing argument. Referring to Spencer's purported statements to Razak, the prosecutor asked the jury, "Did you see them call the nephew to the stand to corroborate what James Spencer said? . . . Maybe [Razak] wouldn't have corroborated it because you can't keep your lies straight, just like Mr. Spencer couldn't keep his lies straight for his reasoning for going south, for his recantation." N.T. Trial 11/1/17, at 75.

The trial court addressed Lark's challenge as follows: "[The prosecutor's] comment was directed at the lack of corroboration of Mr. Spencer's claim that he had lied. In careful fashion, the prosecutor did not comment on [Lark's] failure to present witnesses. That reference to the nephew did not deprive [Lark] of a fair trial." Trial Court Opinion, 7/13/18, at 16.

We discern no abuse of discretion by the trial court in denying Lark's request for a mistrial. The prosecutor's comments focused on the credibility of Spencer's recantation testimony, given that Spencer provided statements to police that Lark confessed to Cho's murder **before** Lark threatened Spencer and his family. When viewed in the context and atmosphere of the entire trial, it is clear that the prosecutor's attack upon Spencer's credibility was in response to, and was commensurate with, the preceding defense claim that Spencer fabricated his statements to police. Accordingly, the prosecutor could permissibly refer to such inconsistent testimony, and that fact that it was not corroborated by Lark's nephew. That being the case, and given that the prosecutor did not characterize his attack on Spencer's credibility as reflecting his own personal opinion, the trial court acted within its discretion in denying Lark's mistrial motion. Thus, no relief is due on Lark's tenth issue.

In his final issue, Lark contends that the trial court abused its discretion in denying his request for a mistrial after the prosecutor referenced the hearsay statement of Muriel Jackson that Lark was Cho's killer. Ms. Jackson's

out-of-court statement was elicited by defense counsel on cross-examination of Carolyn Purvis during the 1985 trial. Ms. Purvis was deceased at the time of Lark's 2017 trial; hence, because she was unavailable, her prior testimony, including Ms. Jackson's hearsay statement, was read into the evidentiary record. According to Lark, the prosecutor's reference to the hearsay statement in his closing argument entitles him to a new trial.

While Lark claims that he objected to Ms. Jackson's hearsay statement, the record indicates otherwise. Lark's prior counsel did not object to that statement during his cross-examination of Ms. Purvis at the 1985 trial. Additionally, when Ms. Purvis's prior testimony was read into the record at the 2017 trial, defense counsel made no objection to the out-of-court statement. Although defense counsel objected to the prosecutor's reference to the statement seven days later during the prosecutor's closing argument, this objection was too late. Because no objection was **_contemporaneously_** made at the time Ms. Jackson's hearsay statement was read into the evidentiary record, the issue is waived. **_See Commonwealth v. Baumhammers_**, 960 A.2d 59, 73 (Pa. 2008) (holding that objections not contemporaneously raised were waived despite having been subsequently raised before the trial court in post-sentence motions); **_see also Commonwealth v. Rosser_**, 135 A.3d 1077, 1086 (Pa. Super. 2016) (*en banc*) (holding that, in order to provide trial courts with an opportunity to correct errors at the time they are made, one

must object to errors, improprieties or irregularities at the earliest possible stage of the criminal adjudicatory process). Accordingly, no relief is due.

Having concluded that Lark is not entitled to relief on any of his issues, we affirm his judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/19/19